UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| RICHARD LEE TABLER, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. W-10-CA-034-RP |
| | § | |
| BOBBY LUMPKIN,[1] Director, | § | * DEATH PENALTY CASE * |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

MEMORANDUM OPINION AND ORDER

Petitioner Richard Lee Tabler was convicted of capital murder and sentenced to death in

March 2007.  After waiving his right to seek habeas corpus relief in state court, Petitioner

unsuccessfully sought federal habeas corpus relief in this Court.  On appeal, the Fifth Circuit

Court of Appeals vacated, in part, the district court's judgment and remanded for consideration

of whether (1) Petitioner can establish cause for the procedural default of any ineffective-

assistance-of-trial counsel ("IATC") claims he may raise, and (2) if so, whether those claims

warrant relief on the merits.

Currently before the Court on these issues are Petitioner's Amended Petition for Writ of

Habeas Corpus (ECF No. 90), Respondent's Answer (ECF No. 99), and Petitioner's Reply (ECF

No. 132).  Having considered the record and voluminous pleadings submitted by both parties, the

Court finds that (1) Petitioner fails to establish cause or prejudice to excuse the procedural

default of his new IATC claims and (2) in the alternative, each of the IATC claims lack merit.

---

[1]  The previous named Respondent in this action was Lorie Davis.  On August 10, 2020, Bobby Lumpkin
succeeded Davis as Director of the Texas Department of Criminal Justice, Correctional Institutions
Division. Under Rule 25(d) of the Federal Rules of Civil Procedure, Lumpkin is automatically substituted
as a party.

For these reasons, the Court concludes Petitioner is not entitled to federal habeas corpus relief or a certificate of appealability.

## I. <u>Background</u>

**A.      <u>The Offense</u>**

In February 2005, Petitioner was indicted for capital murder for the 2004 shooting deaths of Mohamed–Amine Rahmouni and Haitham Zayed.  1 CR 1-2.[2]  Following a three-day trial, Petitioner was found guilty of the charged offenses.  1 CR 249; 24 RR 51-52.  The Texas Court of Criminal Appeals ("TCCA") summarized the evidence presented at Petitioner's trial:

> Mohamed–Amine Rahmouni managed a topless bar called Teazers, where [Petitioner] worked until he and Rahmouni had a conflict.  Rahmouni allegedly told [Petitioner] that he could have [Petitioner]'s family wiped out for ten dollars.
>
> [Petitioner] decided on November 18, 2004, that he would kill Rahmouni after Thanksgiving.  In preparation for killing Rahmouni, [Petitioner] borrowed a 9–millimeter gun, a camcorder, and a pickup truck.  Then, on the night of November 25, 2004, which was Thanksgiving Day, [Petitioner] called Rahmouni with an offer to sell him cheap stereo equipment and told him they would meet in the parking lot of a local business.  Haitham Zayed drove Rahmouni to the parking lot to meet [Petitioner] around 2:00 a.m. on Friday morning.  [Petitioner] and his friend Timothy Payne were waiting for them in the truck that [Petitioner] had borrowed.  As soon as Zayed's car stopped, [Petitioner] shot Zayed and then Rahmouni.  He then exited the truck and pulled both men from the car.  He saw that Rahmouni was still alive, so he shot him a second time.  He had Payne videotape part of the shooting.  Later that day, the videotape was destroyed after [Petitioner] showed it to a friend.  [Petitioner] took a wallet and a black bag that he found inside the car.  On the following Sunday night, [Petitioner] was arrested, and in the early morning hours of Monday, November 29, he confessed to the shootings.

*Tabler v. State*, No. 75,677, 2009 WL 4931882, at *1 (Tex. Crim. App. Dec. 16, 2009).

---

[2]  Throughout this opinion, "CR" refers to the Clerk's Record of Petitioner's trial while "RR" refers to the Reporter's Record.  Both are preceded by volume number and followed by the relevant page numbers.

**B.**     **The Punishment Phase**

The punishment phase of Petitioner's trial began March 26, 2007.  25 RR 4.  The State

gave a brief opening statement summarizing the evidence it intended to present, while defense

counsel reserved their opening statement for later.  Over the course of the next five days, the jury

then heard testimony from twenty-three witnesses presented by the prosecution followed by six

witnesses presented on behalf of the defense.

**1.**     **Evidence Presented by the State**

At punishment, the State presented evidence that Petitioner confessed—in writing and by

videotaped statement—to murdering two Teazers employees, Amanda Benefield and Tiffany

Dotson, just two days after murdering Rahmouni and Zayed.  26 RR 163-81; State's Exhibit

(SX) 64, 114.  According to Petitioner, Benefield and Dotson were on a list of eleven Teazers

employees that he intended to kill.  In his written statement, Petitioner admitted he lured the

women out to the lake with the promise of drugs, accused them of telling people that he had

killed Rahmouni and Zayed, and then shot both women multiple times.  *Id.*  A ballistics expert

concluded the same pistol used to murder Rahmouni and Zayed was used in the killing of

Benefield and Dotson.  26 RR 133-36.  Petitioner's friend and roommate, Kim Geary, testified

that Petitioner bragged about the murders to her later that evening, and that she believed what he

said because Petitioner had already shown her a video recording of the previous murders prior to

destroying the video.  *Id.* at 137-43.

The State also presented evidence that Petitioner called the Bell County Sheriff's Office

the night after he murdered Rahmouni and Zayed.  26 RR 5-15; SX 64.  Petitioner described the

murders and then stated he was at Teazers planning his next double homicide.  He also

threatened to "pick off" undercover officers at the club.  A day later, following the murders of

3

Benefield and Dotson, Petitioner again called the Sheriff's Office to taunt them about the new killings.  26 RR 31.  Petitioner told police about "another one with five shots," and threatened to kill the rest of the Teazers' employees if police failed to close the club.  He also threatened to come after the police.

The jury heard further testimony regarding Petitioner's history of threatening law enforcement officers and fellow inmates.  After being arrested in 2003 for a parole violation, Petitioner escaped from a patrol car while handcuffed, kicked the windows out of another patrol car after he was again detained, and later threatened his parole officer by stating he would "take care of [him] and [his] family."  25 RR 11-16, 24-30.  In September 2004, Petitioner threatened a Michigan police officer investigating a home invasion, telling the officer over the phone that he would "find out [his] full name, [his] social security number, [his] family members' names and somebody would get hurt" if the officer did not drop the investigation immediately.  *Id*. at 43-44.

A few months later, after giving the above confession, Petitioner told the investigating officer that if anyone messed with him while in jail "he would break their neck in 27 places."  26 RR 177.  While in the Bell County Jail awaiting trial, Petitioner was overheard threatening to harm several officers if given the opportunity.  25 RR 53-58, 65, 69-73, 79-88.  In one instance, Petitioner described an officer's home and family before stating that the officer "was going to have to watch what [Petitioner] did to [her] children before he would kill [her] because it would be more torture for [her]."  *Id*. at 71.

Lastly, the jury heard the testimony of A.P. Merillat, an investigator with the Special Prosecution Unit charged with investigating and prosecuting crimes within the Texas prison system.  27 RR 11-29.  Merillat testified generally about the prison classification system in

Texas and the numerous opportunities prisoners have to commit criminal acts of violence despite the heightened security measures in place.

2.    **Evidence Presented by the Defense**

In a brief opening statement, defense counsel stated their intention was to demonstrate Petitioner was "not normal" and thus was undeserving of the death penalty.  27 RR 69-72.  To do so, the defense first presented the testimony of Petitioner's mother and sister regarding Petitioner's difficult childhood, potential birth trauma, and history of psychiatric issues.  *Id*. at 73-170.

Lorraine Tabler, Petitioner's mother, described her troubled marriage with Petitioner's father, Robert Tabler, and the lack of structure in Petitioner's life during his childhood. According to Lorraine, Robert worked long hours, traveled frequently, was unfaithful, and drank excessively.  Her pregnancy with Petitioner was unplanned and Robert wanted her to have an abortion, but she refused.  Once Petitioner was born, Robert took little interest in him and did not treat him the same as he treated their other children.  When Petitioner was a year old, Lorraine went back to work and left Petitioner in the care of his seven-year-old sister and nine-year-old half-brother.  Lorraine decided to leave when Petitioner was ten years old and drove away after rebuffing Petitioner's pleas to take him with her.  Although she returned two years later, she left for good after a few months and only saw the children sporadically thereafter.  At some points during his adolescence, Petitioner lived with Lorraine in both Florida and Nevada, but most of the time he lived with his father in California.

Lorraine further testified Petitioner turned blue, almost black, after he was born because he had taken a lot of fluid into his lungs.  As a child, Petitioner did poorly in school, had trouble paying attention, and had to repeat the third grade.  As a teenager, he once fell out of a tree and

was knocked unconscious.  Petitioner only had one friend growing up and was not attached to anyone other than herself and his sister.  Lorraine noted Petitioner always had a quick temper: "[e]verything goes good for a while and then he just blows up."  *Id*. at 96.  Although Lorraine believed Petitioner is a very loving and affectionate person most of the time, he also is very impulsive and becomes angry in the spur of the moment.  In her opinion, Petitioner did not endure a normal childhood, probably feels abandoned by her and the rest of his family, and is not the way he is by choice.

Petitioner's older sister, Christina Martinez, also testified about the lack of structure during Petitioner's childhood.  Christina was seven years old when Petitioner was born and essentially became his primary caregiver shortly thereafter because of her parents' work schedule and rocky marriage.  Neither parent was around very much, especially Petitioner's father, and their mother left when Petitioner was around nine or ten years old.  As a result, Petitioner led a lonely existence and was always seeking attention from Christina and her friends.  Other than Christina, Petitioner only had one friend growing up.  To her, Petitioner's childhood was "painful" because he was not nurtured and no one, other than her, was there to guide him through life.  *Id*. at 135.

Christina described Petitioner as "not normal" because even as a child he was constantly in need of love and attention.  *Id*. at 124.  Petitioner struggled in school because he could not sit still and would "wreak havoc" in the classroom to get attention—his education probably did not progress past the fourth grade.  *Id*. at 137.  Christina also believed that psychological issues prevented Petitioner from being normal and that his parents or teachers should have sought professional help for Petitioner at an early age.  By the time Petitioner received a diagnoses of Attention Deficit Hyperactivity Disorder (ADHD) at age twelve, it was too late.  Petitioner

always had trouble controlling his emotions, even as an infant, and would be upset one moment and then very loving a second later.  Christina believed Petitioner's psychological issues stemmed, in part, from brain damage he sustained at birth as a result of lack of oxygen to the brain.  In addition, Petitioner injured his head on three different occasions as a teenager.  In her opinion, Petitioner has the mental age of a thirteen year old and, through no fault of his own, lacks the ability to live in society.

Following the testimony of Petitioner's mother and sister, the defense presented the testimony of several mental health experts to demonstrate how Petitioner is "not normal" and to explain "why he is the way he is."  28 RR 7-149.  Dr. Meyer Proler, a clinical neurophysiologist, interpreted an EEG that was given to Petitioner in September 2005 while he was awaiting trial. Dr. Proler found evidence of an abnormality, likely damage, in the left frontal temporal area of Petitioner's brain.  According to Dr. Proler, the frontal lobes are what makes us "particularly human" because they give us the ability to predict, plan, and to understand the meaning of words and possibly their emotional content.  *Id*. at 17.  Dr. Proler would not state beyond a reasonable medical certainty Petitioner has brain damage, only that there was evidence of an abnormality.

The defense next presented Dr. Susan Stone, a psychiatrist and attorney who conducted a psychiatric interview with Petitioner and reviewed seven volumes of Petitioner's social history, school, jail, and medical records prior to testifying.  Dr. Stone came to several conclusions concerning Petitioner, the first of which is that Petitioner "was raised in a very neglectful household with very turbulent parents who were kind of consistently abandoning and neglecting him."  *Id*. at 32.  Dr. Stone next agreed with prior diagnoses that Petitioner suffered from severe ADHD, which made it difficult for Petitioner to control his impulses and rationally assess circumstances, as well as bipolar disorder, which caused mood swings and hallucinations severe

enough to require Petitioner's hospitalization on numerous occasions while he was in the California prison system.

In addition to these "biologic" mental illnesses, Dr. Stone also diagnosed Petitioner as suffering from borderline personality disorder, a "characterologic" illness, due to Petitioner's impulsivity and history of attention-seeking behavior such as self-mutilation and suicidal gestures. *Id*. at 33. She also noted that Petitioner had a history of head injuries and that his EEG indicated a possibility of underlying brain damage. In conclusion, Dr. Stone testified that the combination of the issues "resulted in a real inability for [Petitioner] to rationally assess situations and to use good judgment, to abstract from his mistakes and to control his impulses." *Id*. at 34.

The defense concluded with the testimony of Dr. Deborah Jacobvitz, a professor and child psychologist who specializes in child development and early parent-child relationships. Dr. Jacobvitz testified that Petitioner's childhood history of emotional neglect could have resulted in behavioral or emotional problems, a lack of conscience, or an inability to empathize with other people. She identified several factors from Petitioner's childhood that may have affected his development which she gathered from Petitioner, his mother and father, his sister, and his school and medical records.[3] According to Dr. Jacobvitz, neglect and emotional abuse like that Petitioner suffered "seems to be more damaging and more devastating for children than being physically abused or sexually abused." *Id*. at 119. Although she was not surprised that Petitioner turned out the way he did, she was not there to defend Petitioner or state that he is not

---

[3] These factors included: his father's disinterest; his mother's emotional unavailability; the fact that his sister essentially raised him until he was seven and then effectively abandoned him once she reached high school; his parents' separation when he was nine; and his parents' failure to get Petitioner psychological help until he was around fifteen.

responsible for his conduct.  Rather, she was only trying to help the jury understand his childhood in order to "have a better sense of why he might have did what he did."  *Id*. at 130-31.

### 3.   **Rebuttal and Closing**

In rebuttal, the State called Dr. Richard Coons, a forensic psychiatrist.  28 RR 151-85. Dr. Coons interviewed Petitioner prior to trial and reviewed the same records as Dr. Stone. While Dr. Coons agreed with Dr. Stone that Petitioner suffered from ADHD, he testified that his primary diagnosis was that Petitioner has antisocial personality disorder (ASPD)—what used to be termed sociopathy or psychopathy.  Among other traits, people associated with this diagnosis display a pervasive pattern of disregard for the rights or feelings of others at an early age and are deceitful, manipulative, impulsive, and indifferent to the consequences of their actions. Petitioner displayed almost all of the traits associated with ASPD.

Dr. Coons disagreed with Dr. Stone's diagnosis of bipolar disorder because the data did not support that conclusion and Petitioner never responded to any of the medication (for bipolar disorder) he was given while in the California prison system.  He also believed Petitioner's abnormal EEG was a "red herring," as people with frontal lobe damage generally do not read and write well while Petitioner was a prolific writer whose letters all make sense.  *Id*. at 178.  Instead, Dr. Coons felt very strongly that ASPD was the primary diagnosis for Petitioner, stating "it's hard to find anybody who fits it any better than [Petitioner] does."  *Id*. at 165.  He cautioned, however, that people with ASPD do not lack free will and are not compelled to commit criminal acts; rather, they choose to do so.  But such people do not have much of a conscience and do not feel bad about violating societal norms.  They "do what [they] want to do because [they] want to do it."  *Id*.

Following this testimony, on April 2, 2007, the jury was instructed on the punishment special issues and heard closing argument by counsel.  The defense reiterated that Petitioner was a "flawed" and "damaged" person who should not be held "to the same level of accountability" as the rest of us.  29 RR 17, 21, 30, 34.  During the State's closing, the prosecutor argued that Petitioner's prior violent behavior demonstrates he would present a danger to others in the future and that the evidence presented by the defense regarding Petitioner's childhood and mental health issues did not reduce Petitioner's moral blameworthiness for his actions.  After three hours of deliberation, the jury returned its verdict, finding unanimously (1) beyond a reasonable doubt there was a probability Petitioner would commit criminal acts of violence that would constitute a continuing threat to society, and (2) taking into consideration all of the evidence, including the circumstances of the offense, the Petitioner's character, background, and personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment rather than a death sentence.  29 RR 62-63.  The trial court accordingly sentenced Petitioner to death.  *Id.*

C.      **State Post-Conviction Proceedings**

Pursuant to Texas law, Petitioner's state habeas corpus proceedings progressed simultaneously with his automatic direct appeal to the TCCA.  *See* Tex. Code Crim. Proc. art. 11.071(4)(a).  Accordingly, while his direct appeal was still pending, Petitioner was appointed counsel—attorneys David Shulman and John Jasuta—to represent him in pursuing state habeas corpus relief.  No petition for state habeas relief was filed, however, because Petitioner requested to waive his right to any state habeas proceedings and volunteer for execution.  At the direction of the trial court, Dr. Kit Harrison examined Petitioner and found him to be mentally competent.  The trial court then held a hearing regarding Petitioner's

competency on September 30, 2008.  During the hearing, Petitioner reiterated his desire to waive

his appeals and the trial court questioned Petitioner in order to determine whether the waiver was

knowing and voluntary.  At Petitioner's instruction, Shulman and Jasuta did not contest

Petitioner's competency.  Based upon Petitioner's testimony and the evaluation of Dr. Harrison,

the trial court ultimately found Petitioner competent to waive his postconviction rights and

entered an order on November 5, 2008, granting his request to waive.

In June 2009—well after his state habeas application would have been due—Petitioner

changed his mind and requested that his postconviction rights be reinstated.  Shulman and Jasuta

later supplemented this request by asking the TCCA to establish a new filing date, arguing that

although Petitioner was competent to waive his appeals, he should not have been allowed to due

to his inability to make sound, informed decisions.  The TCCA disagreed and denied counsels'

motion to reinstate the appeal.  *Ex parte Tabler*, No. 72,350-01 (Tex. Crim. App. Sept. 16, 2009).

Three months later, the TCCA affirmed Petitioner's conviction and sentence on direct appeal in

an unpublished opinion.  *Tabler v. State*, No. 75,677, 2009 WL 4931882 (Tex. Crim. App.

Dec. 16, 2009), *cert. denied,* 562 U.S. 842 (2010).  An execution date was then scheduled for

May 20, 2010.

D.      **Federal Post-Conviction Proceedings**

On February 12, 2010, Shulman and Jasuta moved in this Court for appointment and for a

stay of execution.  (ECF Nos. 1, 2).  Two weeks later, the Court, Honorable Judge Walter S.

Smith, Jr. presiding, granted a stay to allow counsel to exhaust remedies through a petition for

writ of certiorari with the United States Supreme Court.  (ECF No. 6).  But in June 2010,

Petitioner sent a handwritten motion to reconsider to the Court indicating his desire for an

execution date and claiming his attorneys requested a stay without his permission.  (ECF No. 8).

11

This motion was forwarded to the Supreme Court where his petition for writ of certiorari was pending.  (ECF No. 9).  A week later, Shulman and Jasuta filed a supplemental pleading with the Supreme Court stating, for the first time, their belief that Petitioner was not competent to waive his appeals.  Despite the supplemental pleading, the petition for writ of certiorari was denied on October 4, 2010.  *Tabler v. Texas*, 562 U.S. 842 (2010).

Shortly thereafter, Shulman and Jasuta returned to federal district court and requested an inquiry into their client's competency to waive his federal habeas appeals.  (ECF No. 11).  The Court appointed Dr. Richard Saunders to conduct a mental health evaluation, who, after examining Petitioner, determined Petitioner was mentally competent.  (ECF Nos. 12, 22).  The Court then held a hearing on August 17, 2011, where it concluded, after hearing Petitioner's testimony, that Petitioner was "not presently suffering from a mental disease, disorder, or defect which prevents him from understanding his legal position and the options available to him or which prevents him from making a rational choice among his options."  (ECF No. 30).[4] Notwithstanding this finding of mental competency, the Court also determined that Petitioner's decision to forego his post-conviction remedies may not have been voluntary.  This determination was a result of a threatening phone call Petitioner made in October 2008 to a state senator which led to an investigation into cell phone smuggling in prison—an investigation which purportedly resulted in pressure from prison inmates and guards for Petitioner to volunteer for execution.  Thus, the Court rejected Petitioner's attempts to waive his appeals and ordered the habeas proceedings to continue.  (ECF No. 34).

---

[4]  Shulman appeared to agree, stating at the hearing:  "I don't think he's incompetent in a legal sense . . . we were never trying to say he's not competent in a sense to stand trial or be executed but just that his decisions are not voluntary."

On October 3, 2011, Shulman and Jasuta filed a preliminary federal habeas corpus petition and simultaneously requested another stay and abatement to allow them to return to state court for exhaustion purposes.  (ECF Nos. 36, 37).  A week later, the Court denied a stay and ordered counsel to file a completed federal petition.  A full petition was then filed on November 13, 2011, raising a total of fourteen grounds for relief.  (ECF No. 39).  On February 9, 2012, the Court issued an order denying the federal habeas petition and denying a certificate of appealability ("COA") on all issues.  (ECF No. 42).  Following the denial of a motion to amend pursuant to Rule 59(e), the Court permitted Shulman and Jasuta to withdraw as counsel and appointed attorney Marcia Widder to represent Petitioner on appeal.

Widder timely filed a notice of appeal and a request for COA with the Fifth Circuit, but on October 3, 2014, the request for COA was denied.  *Tabler v. Stephens*, 588 F. App'x 297 (5th Cir. 2014) (unpublished).  Shortly after the issuance of new Supreme Court precedent,[5] however, the Fifth Circuit vacated its prior decision and remanded to the district court solely to consider whether Petitioner, "represented by his new counsel Widder or other unconflicted counsel, can establish cause for the procedural default of any ineffective-assistance-of-trial counsel claims pursuant to *Martinez*[6] that he may raise, and, if so, whether those claims merit relief."  *Tabler v. Stephens*, 591 F. App'x 281 (5th Cir. 2015); (ECF No. 64).  On remand, Judge Smith established a briefing schedule and appointed additional counsel to assist Widder in her representation.  (ECF Nos. 66, 72).  Petitioner has since submitted approximately 340 pages of briefing on the remand issues supported by over 1,350 pages of exhibits and a disk containing audio and video

---

[5]  *Christeson v. Roper* 135 S. Ct. 891 (2015).

[6]  *Martinez v. Ryan*, 566 U.S. 1 (2012).

exhibits.  (ECF Nos. 90, 93, 94, 121, 122, 132, 133).  In response, Respondent has provided over 250 pages of briefing on the remand issue.  (ECF No. 99).

On September 19, 2016, this case was transferred to the undersigned for adjudication. (ECF No. 130).  Since that time, the Court has twice considered Petitioner's motions for discovery and to stay and abate the proceedings to allow Petitioner to return to state court, each time rejecting the arguments raised by Petitioner.  (ECF Nos. 134, 148).  The Court also denied Petitioner's motion for an evidentiary hearing, finding the substantial record and pleadings before the Court to be more than sufficient to determine the issues on remand.  (ECF No. 148). This proceeding is thus ripe for adjudication.

## II.  Collateral Matters Regarding Waiver

Petitioner's history of requesting to waive his appeals and later withdrawing that request is well documented.  As discussed previously, Petitioner's state habeas proceedings were dismissed at his request after the trial court found him competent to waive his post-conviction rights.  Although Petitioner at one point changed his mind and unsuccessfully attempted to withdraw his waiver, he again sought to waive his post-conviction rights once his federal habeas proceedings began.  (ECF No. 8).  Following an evaluation by Dr. Saunders and a hearing before Judge Smith, Petitioner was once more found competent to waive his rights, but the Court determined Petitioner's federal habeas proceedings should continue because of the existence of certain forces which prevented Petitioner's waiver from being a voluntary choice at the time. (ECF No. 34).  The Court denied Petitioner's initial federal habeas petition in February 2012. (ECF No. 42).  Since that time, Petitioner's correspondence with the Court has been prolific, with Petitioner vacillating between a desire to waive further legal effort on his behalf, (ECF Nos.

56, 65, 84, 102, 115, 139, 140, 142, 143-46), and later wanting to continue with the appellate

process, (ECF Nos. 67, 114, 141, 147).

Beginning in September 2017, Petitioner began expressing to the Court, both in writing

and during a telephonic conference, a consistent desire to waive his right to representation in

federal court.  (ECF Nos. 150-154, 156, 158, 161-167, 169-170).  Without changing his mind,

Petitioner repeatedly stated it was his desire to forego all post-conviction remedies and appeals

so that an execution date could be set.  Because a petitioner unquestionably has a right under

*Rees v. Peyton*, 384 U.S. 312 (1966), to waive representation and further appeals if he

competently and voluntarily chooses to do so, the Court appointed Dr. Michael Arambula to

examine Petitioner to determine whether Petitioner was competent to waive his appeals.  (ECF

No. 179).  The Court also held an evidentiary hearing where it heard expert testimony from four

witnesses, including Dr. Arambula, in addition to discussing the matter with Petitioner himself.

(ECF No. 205).

Following the evidentiary hearing, Petitioner retracted his waiver and elected to go

forward with the appeals process after discussing the matter with counsel and family members.

(ECF Nos. 208, 209).  As it is Petitioner's unquestionable right to waive representation and

further appeals, it is also his absolute right to continue forward with his appeals through the

assistance of counsel if he so chooses.  Thus, the Court granted Petitioner's request to withdraw

his waiver.  (ECF No. 213).

### III. Analysis

The issues before this Court on remand are twofold: (1) whether Petitioner can establish

cause under *Martinez* to excuse the procedural default of any new IATC claims raised by

Petitioner and (2) if so, whether those claims warrant relief on the merits.  (ECF No. 64).   Prior

15

to *Martinez*, an attorney's negligence in a postconviction proceeding could not serve as "cause" to excuse the procedural default of claims in federal court. *Coleman v. Thompson*, 501 U.S. 722, 755 (1991). In *Martinez*, the Supreme Court carved out a "narrow" exception to the *Coleman* rule for IATC claims. *Trevino v. Thaler*, 569 U.S. 413, 422 (2013). Now, a petitioner may meet the cause element by showing (1) that his state habeas counsel were ineffective in an initial-review collateral proceeding,[7] and (2) "that his [IATC claim] is substantial—i.e., has some merit." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013). As discussed below, neither prong is satisfied in this case.

## A.      The *Strickland* Standard of Review

In the habeas context, allegations of ineffective assistance are reviewed under the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, Petitioner must demonstrate (1) counsel's performance was deficient, and (2) this deficiency prejudiced his defense. 466 U.S. at 687-88, 690. This demanding standard applies both in evaluating the potential merit of an underlying IATC claim as well as in evaluating the performance of state habeas counsel. *See Martinez*, 566 U.S. at 14 (suggesting that the *Strickland* standard applies in assessing whether habeas counsel was ineffective). According to the Supreme Court, "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

*Strickland*'s first prong "sets a high bar." *Buck v. Davis*, 137 S. Ct. 759, 775 (2017). "To demonstrate deficient performance, the defendant must show that, in light of the circumstances as they appeared at the time of the conduct, 'counsel's representation fell below an objective

---

[7]  Because Petitioner waived his post-conviction rights, the only state collateral proceeding that occurred was the September 2008 competency hearing. However, the Fifth Circuit has determined that the *Martinez* equitable exception "logically extends" to this proceeding because ineffective state habeas counsel could have prevented an initial-review collateral proceeding from ever taking place. *Tabler v. Stephens*, 591 F. App'x 281.

standard of reasonableness' as measured by 'prevailing professional norms.'"  *See Rhoades v. Davis*, 852 F.3d 422, 431-32 (5th Cir. 2017) (quoting *Strickland*, 466 U.S. at 687-88).  This requires the Court to "affirmatively entertain the range of possible 'reasons . . . counsel may have had for proceeding as they did.'"  *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011).  "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."  *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003).  As such, counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Burt v. Titlow*, 571 U.S. 12, 17 (2013) (quoting *Strickland*, 466 U.S. at 690).

To satisfy *Strickland*'s second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.   In conducting a *Strickland*'s prejudice analysis, a court must "consider all the relevant evidence that the jury would have had before it if [trial counsel] had pursued the different path."  *Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (per curiam).  However, the question "is *not* whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel [had] acted differently."  *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (emphasis added) (citing *Wong*, 558 U.S. at 27).  Rather, the "likelihood of a different result must be substantial, not just conceivable."  *Id.*

B.    <u>State Habeas Counsels' Performance</u>

To establish cause under *Martinez*, Petitioner first contends he received ineffective

assistance of counsel during his state post-conviction proceedings.  The Fifth Circuit summarized

the state court proceedings in its original opinion denying Petitioner a COA:

> On April 24, 2007, attorneys David Schulman and John Jasuta were appointed as
> [Petitioner]'s postconviction counsel.  [Petitioner] was provided with separate
> counsel for his direct appeal, which ran concurrently with his postconviction
> habeas relief.  The State filed its original brief in [Petitioner]'s direct appeal on
> October 1, 2008.  [Petitioner]'s habeas petition was thus required to be filed no
> later than November 17, 2008.  *See* [Tex. Code Crim. Proc.] art. 11.071 § (4)(a)
> (application for writ of habeas corpus must be filed within 180 days after the
> convicting court appoints counsel or 45 days after the state's original brief is filed
> on direct appeal, whichever date is later).
>
> No petition for habeas relief was filed.  On May 15, 2008, [Petitioner] informed
> his attorneys that he wished to waive his postconviction appellate rights.  On
> August 11, 2008, [Petitioner] sent a letter to the Court of Criminal Appeals
> waiving his right to any state habeas proceedings and volunteering for execution.
> The Court of Criminal Appeals referred the matter to the state trial court judge
> who had presided over [Petitioner]'s criminal trial.  The state trial court ordered a
> hearing on [Petitioner]'s competency to waive his appeals and ordered that
> [Petitioner] undergo examination by Dr. Kit Harrison.  Dr. Harrison examined
> [Petitioner] on June 28, 2008, and found him to be mentally competent.  At
> [Petitioner]'s September 30, 2008 competency hearing, the state trial court
> considered Dr. Harrison's evaluation; offered [Petitioner], his attorneys, and the
> State an opportunity to present additional evidence relevant to the competency
> determination; and questioned [Petitioner] in open court to determine whether his
> waiver was knowing and voluntary.  During this questioning, the judge presented
> [Petitioner] with the letter he had written to the Court of Criminal Appeals and
> asked him to explain his request.  [Petitioner] replied: "Basically, I'm asking the
> Court of Appeals to drop all of my appeals after my direct appeal.  And should
> my direct appeal be denied, I'm asking for an execution date as soon as possible."
> Upon [Petitioner]'s instruction, Schulman and Jasuta did not contest the State's
> evidence of competency.  The state court found [Petitioner] competent to waive
> his postconviction rights.

*Tabler v. Stephens*, 588 F. App'x at 299-300.

In that same opinion, the Fifth Circuit rejected the notions that the state court competency

hearing violated Petitioner's due process rights or that Schulman and Jasuta were ineffective for

failing to challenge his competency.  *Id*. at 302-06.  Nevertheless, following the Fifth Circuit's

remand to this Court to consider anew whether Petitioner can establish cause under *Martinez*, Petitioner essentially makes the same argument about Schulman and Jasuta that was rejected by the Fifth Circuit—that counsel abandoned their obligation to adequately investigate and challenge Petitioner's competency to waive, resulting in the procedural default of the numerous IATC claims contained in his amended petition.  But as the Fifth Circuit found, counsel did not abandon their client as Petitioner now suggests.  To the contrary, counsel complied with their client's desire to waive further appeals on his behalf.  As the Fifth Circuit noted, "[n]either the Supreme Court nor this court has ever held that a lawyer provides ineffective assistance by complying with the client's clear and unambiguous instructions not to present evidence."  *Id*. at 306 (citing *Wood v. Quarterman*, 491 F.3d 196, 203 (5th Cir. 2007)); *see also Autry v. McKaskle*, 727 F.2d 358, 362-63 (5th Cir. 1984) (holding trial counsel ethically obligated to comply with defendant's knowing directive not to present mitigating evidence nor required to seek a competency hearing before complying with that directive).

    Citing *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990), Petitioner argues that his attorney's acquiescence to his wishes constitutes ineffective assistance because they were obligated to contest his waiver.  But neither *Bouchillon* nor any of the other cases cited by Petitioner from other circuits stand for such a proposition.[8]  In *Bouchillon*, counsel was found ineffective for allowing his mentally ill client to plead guilty without having him evaluated or conducting an investigation "of any kind."  *Id*. at 596.  Unlike counsel in *Bouchillon*, however, Schulman and Jasuta were aware of Petitioner's mental health issues and hired Dr. Harrison to conduct a neuropsychological evaluation of their client after receiving some "bizarre"

---

[8]  Indeed, despite having had the opportunity to do so, the Supreme Court has yet to hold that a competency hearing must be adversarial in nature in order to be full and fair and to afford a prisoner the process he is due.  *See, e.g., Hamilton v. Texas*, 497 U.S. 1016 (1990) (misc. order).

correspondence from him regarding his desire to waive his appeals.  (ECF No. 90 at 117-119; ECF No. 90-3 at 72-76).  Given that Dr. Harrison found Petitioner competent and that counsel agreed with this determination, counsels' decision not to contest Petitioner's decision to waive is imminently reasonable.  (ECF No. 90-4 at 8, 25; ECF No. 90-6 at 1-17).

Petitioner also argues counsel were ineffective because they (1) failed to advise him of the correct date his state habeas application was due and (2) failed to investigate and develop claims for relief both before and after his competency hearing.  According to Petitioner, he could not have knowingly and voluntarily waived his state habeas appeals without knowing when the application was due or what it would entail.  But having reviewed the record and exhibits provided by Petitioner, the Court concludes Petitioner was aware of the relevant filing deadlines[9] and that counsel conducted an extensive investigation in preparation for filing a state habeas petition on Petitioner's behalf.  Among other things, the record indicates counsel sought and reviewed records from the trial defense team, including investigators and experts, began a mitigation investigation with the assistance of two mitigation specialists, and sought the assistance of Dr. Harrison, a psychologist, to conduct a neuropsychological examination of Petitioner as part of a mitigation investigation.  The voluminous letters and emails to and from counsel submitted by Petitioner also demonstrate counsel did not abdicate their responsibility to Petitioner, but rather were diligently representing their client and were in the process of conducting a thorough investigation into potential claims for relief.  As such, Petitioner fails to demonstrate that counsels' performance was deficient.

---

[9]  Even if Petitioner was misled about the deadline for filing a state habeas petition, such an error would be harmless because Petitioner was *waiving his right* to such collateral review.  *See Tabler v. Stephens*, 588 F. App'x  at 303, fn.5 ("Because he was forfeiting his right to pursue collateral relief, it is irrelevant that the court [or counsel] provided ambiguous information as to the filing deadline.").

Regardless, Petitioner cannot establish he was prejudiced by counsels' failure challenge his competency.  Although Petitioner contends counsel were "obligated" to contest Petitioner's waiver because they were aware of his mental health issues, "the presence or absence of mental illness or brain disorder is not dispositive" as to competency.  *United States v. Mitchell*, 709 F.3d 436, 440 (5th Cir. 2013) (citing *Mata v. Johnson*, 210 F.3d 324, 329 n.2 (5th Cir. 2000)). Moreover, these issues were already known to Dr. Harrison when he conducted his evaluation and were also known to the trial court because they were presented at length during Petitioner's punishment phase and the same judge that presided over Petitioner's trial presided over his competency hearing.  It is therefore unlikely that "the result of the proceeding would have been different" had counsel chosen to oppose Petitioner's waiver.  *Strickland*, 466 U.S. at 694.  Again, the "likelihood of a different result must be substantial, not just conceivable."  *Richter*, 562 U.S. at 112.

Finally, Petitioner was ultimately found to be competent by the trial court after reviewing Dr. Harrison's summary report and interviewing Petitioner in open court regarding his decision. This finding of fact is presumed correct under 28 U.S.C. § 2254(e)(1), and Petitioner has failed to overcome that presumption by clear and convincing evidence.  *See also Mays v. Stephens*, 757 F.3d 211, 216 (5th Cir. 2014) (finding no prejudice where there is no evidence of incompetency). It necessarily follows that Petitioner was not prejudiced by counsels' performance, as he cannot establish the results of his proceeding would have been different had counsel contested his competency.  As such, Petitioner cannot make the showing of prejudice necessary under *Strickland*'s second prong and thus cannot establish cause under *Martinez* to excuse the procedural default of his new IATC claims.

C.     __The Underlying IATC Claims__

Regardless of whether Petitioner establishes a valid claim of ineffective state habeas counsel under *Martinez*, he still would not be entitled to excuse any procedural bar because the allegations brought forth in his amended petition are meritless.  Again, to overcome a default under *Martinez*, a petitioner must also demonstrate that the underlying IATC claim "is a substantial one."  *Martinez*, 566 U.S. at 14 (citing *Miller–El v. Cockrell,* 537 U.S. 322 (2003)). "For a claim to be 'substantial,' a petitioner 'must demonstrate that the claim has some merit.'" *Reed v. Stephens*, 739 F.3d 753, 774 (5th Cir. 2014) (quoting *Martinez*, 566 U.S. at 14). "Conversely, an 'insubstantial' ineffective assistance claim is one that 'does not have any merit' or that is 'wholly without factual support.'"  *Id*. (quoting *Martinez*, 566 U.S. at 15-16).

On remand, Petitioner raises IATC claims arguing that trial counsel were constitutionally defective at both the guilt/innocence stage[10] and punishment stage[11] of the trial.  Petitioner also argues counsel were ineffective for failing to establish that he was categorically ineligible for the death penalty and that the cumulative prejudicial effect of counsels' errors at both stages of trial denied him the right to effective counsel.  Petitioner is unable, however, to overcome the

---

[10]  Petitioner's first four IATC claims allege that his trial counsel were ineffective prior to or during the guilt/innocence phase of Petitioner's trial for failing to: (1) provide effective representation during voir dire by asking meaningful questions of prospective jurors and objecting to misleading statements by the prosecution and trial court; (2) move to suppress Petitioner's statements to police on the grounds that they were the product of insufficient *Miranda* warnings and coercive police questioning; (3) marshal significant evidence concerning this alleged police coercion; and (4) properly impeach State witness Kimberly Geary.

[11]  Concerning the punishment phase of trial, Petitioner alleges that counsel failed to: (1) conduct an adequate investigation into Petitioner's background and mental health; (2) prepare and present appropriate mental health evaluations; (3) adequately prepare their expert witnesses to testify; (4) adequately rebut or mitigate evidence presented by the prosecution; (5) object to the admission of unadjudicated offenses; (6) object to the admission of extraneous victim-impact and victim-character evidence; (7) develop and present evidence regarding the low probability Petitioner would be paroled if sentenced to life imprisonment; and (8) object to an improper closing argument by the prosecution.  Petitioner also contends that counsel presented a closing argument that was inflammatory and harmful to his defense.

rigorous burden of proof required under *Strickland* to demonstrate ineffective assistance.  As a result, Petitioner fails to establish cause under *Martinez* that would excuse his unexhausted IATC claims from being procedurally defaulted.  Alternatively, even if the Court were to look past the procedural default and review the claims *de novo*, relief would be denied because the claims lack merit.

1.      <u>Voir Dire</u> **(Claim I(A))**

Petitioner first alleges that trial counsel provided ineffective assistance during voir dire. Petitioner's allegation is essentially a four-part IATC claim alleging the following:  (1) counsel failed to engage in meaningful questioning of potential jurors to determine if they were biased; (2) counsel abdicated their responsibility to ensure the selection of an impartial jury by agreeing to the removal of over forty jurors solely on the basis of their questionnaires;[12] (3) counsel agreed to excuse a prospective juror without attempting to rehabilitate him after the prosecution questioned him; and (4) counsel failed to object when the State and the trial court misstated the law.  In response, Respondent argues the above allegations are speculative and that counsels' performance was reasonable and the result of sound trial strategy.

a.      <u>Meaningful Questioning</u>

In his first subclaim, Petitioner asserts the voir dire testimony and questionnaire answers from several prospective jurors suggested a bias against Petitioner which rendered the jurors unfit for jury service.  Despite this apparent bias, Petitioner contends that his trial counsel failed to ask follow-up questions to determine whether these prospective jurors were competent to

---

[12] In his briefing, Petitioner also maintains that his appellate counsel was ineffective for not challenging trial counsels' agreement, and the statute which permits such agreements, in a post-sentence motion or on direct appeal.  (ECF No. 90 at 152).  However, *Martinez* is a "narrow exception" that applies only to claims alleging ineffective assistance by trial counsel.  *Martinez*, 566 U.S. at 9-18; *see also Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (declining to extend *Martinez* to claims alleging ineffective assistance of appellate counsel).  Because *Martinez* has no effect on the procedural default of any claims concerning appellate counsel, the Court will not address this allegation further.

serve.  As a result, three allegedly biased jurors (Karen Lindberg, John Gauntt, and Laticia Rudd) were allowed to serve as jurors while two other jurors (Albert Musgrove and Dale Motl) had to be struck by peremptory challenge instead of for cause.

Petitioner correctly states that "[v]oir dire plays a critical function in assuring the criminal defendant that his constitutional right to an impartial jury will be honored." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (quotation omitted).  But "no hard-and-fast formula dictates the necessary depth or breadth of voir dire." *Skilling v. United States*, 561 U.S. 358, 362 (2010). Because every attorney will likely conduct voir dire in a different manner, the mere fact that another attorney might have asked different questions will not support a finding of ineffective assistance. *See Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013) ("Moreover, Garza cites no authority, and we have found none, that would require a defense attorney to ask specific questions at voir dire.").  Rather, a defense attorney's method of voir dire is strategic and entitled to substantial deference, and thus "cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness." *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995) (quotation omitted).

In the context of determining whether the failure to strike an allegedly partial juror constitutes deficient performance, a court must first evaluate whether the juror at issue was actually biased. *Virgil v. Dretke*, 446 F.3d 598, 608-10 (5th Cir. 2006).  The bias determination centers on a juror's own indication that he/she has "such fixed opinions that he could not judge impartially respondent's guilt." *Patton v. Yount*, 467 U.S. 1025, 1035 (1984); *Virgil*, 446 F.3d at 607 (holding that "the Supreme Court's treatment of the right to an impartial jury is more than a mere backdrop to our analysis; it is the lens through which we must examine counsel's

24

performance in this case.") (citation omitted).  In other words, this Court must determine "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath.'"  *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).

Based on the above criteria, the Court's review will center on whether one of the jurors cited by Petitioner was biased and, if so, whether additional questioning by counsel would have made the juror subject to removal by cause.  *See Villanueva v. Stephens*, 555 F. App'x 300, 306 (5th Cir. 2014) (unpublished) (to establish deficient performance, a petitioner "must identify any particular juror who was in fact prejudiced and must establish that had counsel's questioning focused on a specific area of bias, the bias would have been found.").

(i)    <u>Karen Lindberg</u>

Petitioner states counsel accepted Lindberg without having a "meaningful understanding" of Lindberg's views on the death penalty, citing to a portion of voir dire where Lindberg states her belief that the death penalty would be inappropriate for someone who killed to protect another person, such as a kid.  18 RR 27.  Petitioner contends Lindberg "had no idea what a conviction for capital murder entailed" and faults counsel for not clarifying whether Lindberg would automatically impose the death penalty in a case where the jury already found the defendant guilty and considered him to be a continuing threat to society.  (ECF No. 90 at 161-62).

Aside from whether Lindberg's statement warranted further clarification from counsel, the record demonstrates she did not have "such fixed opinions that [she] could not judge impartially respondent's guilt."  *Patton*, 467 U.S. at 1035.  Quite the opposite, Lindberg repeatedly stated during cross-examination by counsel that she would consider all of the

25

evidence before deciding whether the death penalty was appropriate.  18 RR 29 ("You've got to look one day at a time, one piece of evidence at a time and put it all together"), 32 ("You have to look at all the circumstances"), 35 ("You have to look at everything"), 37 (stating that punishment is "not an algebra formula" and you have to "look at everything" to make a decision).  Under a hypothetical proposed by counsel where she was serving on a jury with another juror who believed "if you kill, you should be killed," Lindberg stated she would respond by explaining that "[y]ou can't just look at a picture . . . you've got to listen to what's going on in the back." *Id*. at 37-38.

There is nothing in the record to indicate Lindberg was a biased juror or that her views would "prevent or substantially impair the performance of [her] duties as a juror." *Witt*, 469 U.S. at 424.  Petitioner's emphasis on one answer both mischaracterizes Lindberg's ability to be impartial and misrepresents counsels' efforts to ensure her qualifications as a juror.

(ii)    <u>John Gauntt</u>

Petitioner contends Gauntt, an attorney, was never asked a single question to elicit his opinions about the death penalty.  He undermines this assertion by citing several instances where Gauntt agrees with the prosecution that the death penalty should be a "last resort" reserved for the "worst criminals."  19 RR 72, 74-75.  Acknowledging these statements, Petitioner faults counsel for not asking follow-up questions to ascertain further whether Gauntt "could fairly consider a life sentence in [Petitioner]'s case."  (ECF No. 90 at 163).

It is Petitioner's burden to establish that Gauntt was biased and could not act as an impartial juror in his case.  *Virgil*, 446 F.3d at 608-10.  Petitioner does not meet this burden.  Instead, he accuses counsel of ineffective representation based on speculation that further questioning may have uncovered something more about Gauntt's views on the death penalty.

26

Such speculative assertions do not constitute a meritorious IATC claim.  *See Garza*, 738 F.3d at

675-76 (rejecting as speculative Garza's allegation that trial counsel were ineffective for failing

to ask what jurors would do in a hypothetical case similar to Garza's).  Moreover, the record

indicates Gauntt believed the death penalty to be a "last resort," and that he would answer the

special issues based on all the evidence presented.  19 RR 75-76, 83.  Gauntt agreed that each

juror must decide what they consider to be mitigating and concluded by stating he has no

problem "following an oath that I've done [] all my life."  *Id*. at 82-84.   Nothing in Gauntt's

answers indicated bias or required any further questioning from counsel.

(iii)    <u>Laticia Rudd</u>

Citing Rudd's juror questionnaire and voir dire testimony indicating her belief that the

death penalty is appropriate in heinous cases where the defendant intentionally killed and

showed no remorse for his/her actions, Petitioner contends counsel were ineffective for failing to

ascertain whether Rudd could consider a life sentence in such circumstances.  Petitioner appears

to ignore the part of the record where counsel did make such an inquiry.  15 RR 155-60.  Aside

from whether the cited questionnaire and voir dire response could have led to more in-depth

questioning by counsel, however, Petitioner fails to demonstrate Rudd was actually biased or

"had such fixed opinions that [she] could not judge impartially respondent's guilt."  *Patton*, 467

U.S. at 1035.

Rudd's voir dire examination indicated she would keep "an open mind," consider all of

the evidence, and could return either a life or death sentence depending on the evidence.  15 RR

139-73.  Although she believed the death penalty was meant for those who committed heinous

crimes "without remorse," Rudd did not believe everyone who committed capital murder and

was found to be a future danger should automatically receive a death sentence.  Instead, she

27

indicated a willingness to listen to all of the evidence presented before making a determination, including a defendant's life history and mental health, and would not require a defendant to take the stand in order to show remorse.  In short, Rudd's testimony demonstrated she was not a juror whose views would "prevent or substantially impair the performance of [her] duties as a juror." *Witt*, 469 U.S. at 424.

Petitioner also faults counsel for failing to ascertain whether Rudd would be biased as a result of pending criminal charges against her husband for spousal abuse.  In her juror questionnaire and again under examination by the prosecution, Rudd admitted there was a pending charge against her husband but stated her belief that the charges would be dropped in February 2007, before Petitioner's trial.  (ECF No. 93 at 58); 15 RR 141.  Petitioner contends this testimony is false because the charges were not actually dropped until May 2007, well after Petitioner's trial, a situation that jeopardized Rudd's ability to remain impartial given the need "to curry favor with the State as a means to ensure that the charges against her husband were eventually dropped."  (ECF No. 90 at 166).  But not only is this interpretation of the record incorrect—Rudd only stated her belief the charges would be dropped, not when they would actually be dropped—Petitioner's contention that Rudd "needed to curry favor" with the State in order to ensure the charges were dropped is speculation.

Regardless, Petitioner's selective reading of the record does not establish Rudd's bias against Petitioner.  In fact, it could establish the opposite.  Rudd was apparently the victim of assault by her husband but chose to speak with the prosecutors about dropping the charges. Rudd agreed with defense counsel that she was "making a judgment call about [her husband's] background, about his character and about  . . . the probability for the future" when she did so. 15 RR 158.  This is in line with Rudd's other testimony establishing she could be a sympathetic

juror and would consider all the evidence about a defendant's background and character before making a determination on punishment. Thus, Petitioner has not shown that counsel needed to ask Rudd any additional questions regarding her husband's case. *See United States v. Fisher*, 480 F. App'x 781, 782 (5th Cir. 2012) (unpublished) (finding counsel was not ineffective in failing to question or challenge a potential juror because there was no credible evidence that the juror was biased).

(iv)    <u>Albert Musgrove and Dale Motl</u>

Prospective jurors Albert Musgrove and Dale Motl did not serve on Petitioner's jury, but rather were peremptorily struck by counsel following the end of voir dire. Petitioner contends counsel struck the jurors without adequately determining whether they were excusable for cause, which would have saved the defense a peremptory challenge.[13] Similar to the previous jurors, Petitioner fails to demonstrate Musgrove and Motl "had such fixed opinions that [they] could not judge impartially respondent's guilt." *Patton*, 467 U.S. at 1035. Both prospective jurors' testimony generally indicated an ability to consider the evidence and follow the law when making a determination on a defendant's guilt and potential punishment, and neither displayed a bias that would "prevent or substantially impair" their performance as jurors if chosen. 13 RR 199-230; 15 RR 116-34.

In any event, simply because counsel were forced to use a peremptory strike does not indicate they were ineffective. "So long as the jury that sits is impartial, the fact that [the petitioner] had to use a peremptory challenge to achieve that result does not mean that the Sixth Amendment was violated." *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988). Petitioner failed to

---

[13] Counsel did attempt to challenge Musgrove for cause after questioning him, but the trial court determined there was not "sufficient reason at this point to grant a challenge for cause." 15 RR 133. Petitioner contends counsel should have continued to question Musgrove to ascertain whether he could be struck for cause.

demonstrate an impartial juror sat on his jury, much less that one was imposed upon him because counsel were forced to use their remaining peremptory strikes on prospective jurors challengeable for cause.  As such, Petitioner was not prejudiced by counsels' refusal to question the jurors further.  *Id*. at 89 (holding the failure to remove a challengeable juror for cause "is grounds for reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him."); *see also Soria v. Johnson*, 207 F.3d 232, 241-42 (5th Cir. 2000) ("[B]ecause [the venire member] did not sit on [the petitioner's] jury, [the petitioner] is precluded from making a substantial showing of the denial of a federal right with respect to this claim.").

> b.     Potential Jurors Excused By Agreement

Under Texas Code of Criminal Procedure Article 35.05, a prospective juror "may by consent of both parties be excused from attendance by the court at any time before he is impaneled."  Petitioner states that the parties in this case agreed to dismiss over forty prospective jurors without ever questioning them to assess their demeanor and the credibility of their jury questionnaire answers.  According to Petitioner, counsels' decision "abdicated their responsibility to ensure the selection of a fair and impartial jury" because several of the jurors (Petitioner names four) were not challengeable for cause based on the answers they gave to the jury questionnaire.  (ECF No. 90 at 175).

Counsels' actions during voir dire "are considered to be a matter of trial strategy." *Teague*, 60 F.3d at 1172.  As stated previously, "[a] decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness.'"  *Id.*; *see also United States v. Mullins*, 315 F.3d 449, 453 (5th Cir. 2002) (reiterating that a court must be "highly deferential

to counsel's trial strategy" in determining whether counsel's performance was deficient). Here, the record is silent as to why the agreed-upon jurors were struck by the parties, and Petitioner does not allege that the excusals were based on race or any other impermissible factor. Nor does Petitioner establish that the removed jurors were favorable to the defense or would have served on Petitioner's jury had they not been excused. Instead, Petitioner takes issue with counsels' agreement based solely on his subjective belief that the jurors were not yet removable for cause because they had not been questioned. Yet, there is no authority requiring all potential jurors to be questioned, and Texas law allows excusal by the consent of parties. Because counsels' decision to remove the jurors by agreement falls within an area traditionally reserved for strategic decision, Petitioner's argument fails. *Teague*, 60 F.3d at 1172.

       c.      <u>Prospective Juror Wayne Bickham</u>

Petitioner next contends that counsel were ineffective by agreeing to excuse prospective juror Wayne Bickham without asking Bickham a single question. During examination by the prosecutor, Bickham got hung up on questioning concerning his views on life imprisonment and whether a defendant would be subject to parole in forty years:

Q:     No. You're not even worried about [parole]. And—

A:     How—how—no. No. I have to be. How can I make the decision for the life option without considering that? I can't do that.

Q:     Because you're not. All you're doing is answering these questions. The judge is going to instruct you you can't consider how parole would be applied in this case.

A:     Then I'm not a candidate for your jury.

Q:     You just couldn't keep from considering that, right?

A:     I don't see how I could.

16 RR 132.  Counsel chose not to attempt to rehabilitate Bickham and agreed to excuse him from the jury.  *Id*. at 134.

Petitioner fails to overcome the presumption that counsels' excusal of Bickham was sound trial strategy.  *Strickland*, 466 U.S. at 689; *Teague*, 60 F.3d at 1172.  Counsel had an obvious reason to excuse Bickham—his inability to keep from considering the possibility of parole when assessing punishment—and counsel were under no obligation to question Bickham further in order to rehabilitate him.  Because counsels' decision to remove Bickham by agreement falls within an area traditionally reserved for strategic decision, and this strategy was clearly reasonable, Petitioner fails to demonstrate that counsel were ineffective.  *Teague*, 60 F.3d at 1172; *see also Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) (reiterating that "a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under then prevailing professional norms").

### d.    Alleged Misstatements of Law

Finally, Petitioner contends counsel were ineffective for failing to object to misstatements of the law made by the prosecution and the trial court.  Specifically, Petitioner argues the following: (1) the prosecution repeatedly told prospective jurors that all twelve chosen jurors had to agree that mitigating circumstances existed before a life sentence was warranted, rather than just ten as required by Texas law; (2) the prosecution repeatedly promoted standardless decision-making by telling the jurors it was up to them to determine the meaning of the special issues; (3) the prosecution told jurors that mitigation must have a "nexus" to the crime; and (4) both the prosecution and the trial court informed numerous jurors during voir dire that a life sentence in this case meant a forty-year sentence.

Once again, counsels' actions during voir dire "are considered to be a matter of trial strategy" that do not constitute ineffective assistance unless they are "so ill chosen that it permeates the entire trial with obvious unfairness." *Teague*, 60 F.3d at 1172.  Petitioner does not make this showing, as it does not appear that any of the cited instances demonstrate that either the prosecution or trial court misstated the law to the jury in any meaningful way.  Because counsel are not required to make futile objections, review of Petitioner's claim could end there. *Miller v. Thaler*, 714 F.3d 897, 904 n.6 (5th Cir. 2013).

Nevertheless, even if the record demonstrated that the prosecution or trial court misstated the law, a great deal of time had passed between voir dire and the jury's deliberation at the punishment phase.  The jury had heard significant evidence and argument at both phases of trial, making it unlikely they remembered the complained-of statements.  The Court is therefore "skeptical that, by the time their . . . deliberations began, the jurors would have remembered the explanations given during voir dire, much less taken them as a binding statement of the law." *Penry v. Johnson*, 532 U.S. 782, 801 (2001).

Moreover, the trial court correctly instructed jurors before their deliberations on how to consider the evidence in answering the special issues.  *See* CR 270-77.  "A jury is presumed to follow its instructions." *Blueford v. Arkansas*, 566 U.S. 599, 606 (2012) (citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)).  As such, the jury charge ameliorated any harm from the prosecution's alleged misstatements during voir dire because jurors were given a full ability to give effect to Petitioner's evidence under the mitigation special issue.  *See Styron v. Johnson*, 262 F.3d 438, 454 (5th Cir. 2001) (finding that, despite prosecutor's misstatement of the law during voir dire, there was no constitutional error because the court properly instructed the jury in accordance with law).

Given the significant amount of time, evidence, and testimony that the jury had to consider after hearing the prosecutor's statements, and in light of the correct jury instructions, "[t]he comments of . . . counsel during voir dire were surely a distant and convoluted memory by the time the jurors began their deliberations on . . . [Petitioner's] sentence." *Penry*, 532 U.S. at 802. Thus, this portion of Petitioner's first allegation fails to establish either prong of the *Strickland* analysis.

        e.    <u>Summary</u>

Petitioner's multifaceted allegation fails to demonstrate that an impartial juror sat on his jury or that counsels' strategy during voir dire was anything but reasonable. Rather, Petitioner's allegations reveal that trial counsel did not conduct voir dire in a manner that Petitioner's present counsel, in hindsight, would have conducted voir dire. But "[t]he Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (citing *Bell v. Cone*, 535 U.S. 685, 702 (2002)). Petitioner has not shown that trial counsel provided deficient performance, or that actual prejudice resulted, from counsels' performance during voir dire. Consequently, the Court concludes that Petitioner's first claim lacks merit and, because the claim is "insubstantial," that the procedural-bar exception in *Martinez* is unavailable. *See Martinez*, 566 U.S. at 14.

        2.    <u>**Petitioner's Statements**</u> (Claims I(B) and I(C))

On the night he was arrested, Petitioner gave several statements to police before finally confessing to the murders. During a pretrial hearing on a motion to suppress, counsel unsuccessfully argued the statements should not be admitted since they were the product of an unlawful, warrantless arrest. Petitioner now argues counsel were ineffective for not attempting

to suppress the statements on the grounds they were obtained without sufficient *Miranda*[14]

warnings and were the product of coercive police questioning.  In a somewhat redundant

allegation, Petitioner also claims counsel were ineffective for failing to marshal evidence

suggesting the statements were coerced.  Petitioner's allegations do not meet either prong of the

*Strickland* analysis.

        a.    <u>Background</u>

     The TCCA summarized the facts surrounding Petitioner's statements in its opinion on

direct appeal:

> Killeen Police Officer Robert Clemons and Bell County Sheriff's Department
> Investigator Timothy Steglich testified at the pre-trial suppression hearing.
> Clemons testified that toward the beginning of November, [Petitioner] had begun
> "working off" a pending theft case stemming from his purchase of stereo
> equipment with fraudulent checks.  [Petitioner] signed a contract in which he
> agreed to cooperate as a confidential informant in a drug investigation in
> exchange for nonprosecution of the theft.[15]  An investigator in the Bell County
> District Attorney's Office introduced [Petitioner] to Clemons.  [Petitioner]
> worked with Clemons on a controlled drug buy on November 4, 2004.
>
> In the course of investigating the murders of Rahmouni and Zayed, the Bell
> County Sheriff's Department identified [Petitioner] as a "person of interest."
> Around 4:00 p.m. on November 28, 2004, which was the Sunday following
> Thanksgiving, Steglich, who was leading the murder investigation, contacted
> Clemons and asked him to speak with [Petitioner] about setting up a controlled
> drug buy.  Both Steglich and Clemons understood that the drug buy was just a
> ruse.  They wanted [Petitioner] to set up the buy and then go to the police station
> to meet Clemons so that they could arrest him on his pending theft case and then
> question him about the murders.  Both officers were aware that no arrest warrant
> had been issued.  Steglich had begun working with the district attorney's office on
> this matter some time before he contacted Clemons.  However, he did not obtain
> an arrest warrant until about 10:55 p.m. that evening.
>
> Clemons left a voice-mail message with [Petitioner] around 4:30 p.m., and
> [Petitioner] returned his call around 7:00 p.m.  [Petitioner] agreed to set up the
> drug buy and meet Clemons at the police station.  He set up the buy and called

---

[14]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

[15]  The precise terms of this contract are not in the record.

Clemons to say that "Chris" would not be able to obtain the drugs until after 9:00 p.m. [Petitioner] arrived at the police station around 9:15 p.m., and Clemons went through the motions of preparing for the buy. Steglich called in with updates about his progress in obtaining the arrest warrant. In turn, the police officers informed Steglich that [Petitioner] was becoming anxious to leave and make the drug buy. At about 9:25 p.m., Steglich instructed Clemons to arrest [Petitioner], despite the fact that Steglich had not yet obtained a warrant.[16]

Clemons testified that [Petitioner] was enthusiastic about helping with the drug buy. Clemons did not view [Petitioner]'s anxiety to leave the police station as a desire to flee; rather, he believed that [Petitioner] was anxious to complete the drug buy because it was getting late and his seller would be waiting for him as scheduled. Clemons initially handcuffed [Petitioner] incident to frisking and "wiring" him in preparation for the drug buy, and Clemons kept [Petitioner] handcuffed after he received instructions to arrest him. Clemons acknowledged that he did not *Mirandize* [Petitioner] in connection with his arrest until around 10:05 p.m. *See Miranda v. Arizona* []. As soon as [Petitioner] was informed he was under arrest for theft, he spontaneously volunteered that he had information about the murders. [Petitioner] indicated that his friend "Tim" had committed the murders and then told him all the details. He said he wanted to talk to someone in the district attorney's office. Clemons testified that [Petitioner] was still focused on getting his theft case dropped. Clemons did not interrogate [Petitioner] at that time, but [Petitioner] kept talking.

Steglich testified that he believed that [Petitioner] would flee if Clemons let him leave the police station to complete the drug buy. However, Steglich also testified that he had the impression that [Petitioner] was anxious to leave because he wanted to complete the drug buy, not because he wanted to escape. Even without direct evidence that [Petitioner] intended to escape, Steglich believed that [Petitioner] was "an extreme flight risk" based on his knowledge that [Petitioner] had arrests from several states, had moved frequently between states shortly before arriving in Killeen, was not steadily employed, had given two addresses in Killeen as his residence, and "other matters, including a warrant outstanding out of Florida that [Steglich] was unable to confirm." Therefore, when Steglich heard that [Petitioner] was becoming anxious to leave, he instructed Clemons to arrest him. Steglich did not begin questioning [Petitioner] until after he had obtained the magistrate's signature on the arrest warrant and [Petitioner] had been transported to the county jail.

After they had the arrest warrant, both Steglich and Clemons interrogated [Petitioner]. Clemons testified that, when they began the interrogation, he recorded it with a digital audio recorder, but the recorder's memory ran out before the first statement was completed and none of the remaining interrogation was

---

[16] Clemons testified that Steglich told him the warrant had been obtained before he arrested [Petitioner], but he also testified that Steglich told him to arrest [Petitioner] without a warrant because he was a flight risk. This inconsistency does not affect [the state court's] resolution of this claim.

recorded.  In [Petitioner]'s first written statement, he stood by his original story that Tim had committed the murders and then told [Petitioner] about them.  This statement was taken at 12:20 a.m. on November 29.  Steglich did not believe that [Petitioner] had told them everything because he was being evasive, fidgeting, failing to make eye contact, and focused on leaving the building.  Therefore, they interrogated [Petitioner] further.  Steglich acknowledged that by then he was pressing [Petitioner] for information.  [Petitioner] took bathroom breaks and drank coffee throughout the interrogation.

After additional questioning, [Petitioner] gave a second written statement which, unlike the first statement, included initialed *Miranda* warnings and a signed waiver.  In it, [Petitioner] admitted that he was present while Tim committed the murders, and he gave consent to search his rooms at two residences as well as the car he had driven to the police department.  This statement was taken at 2:20 a.m.

Still not satisfied that [Petitioner] had told them the whole story, Steglich and Clemons continued to question [Petitioner].  Steglich acknowledged that by then, he was moving in front of [Petitioner], demanding eye contact, and asking [Petitioner] if he had ever lost a family member.  [Petitioner] became very emotional.  Steglich had the impression that [Petitioner] realized he had lost control of the interview and was wearing down.  However, [Petitioner] never said that he did not want to talk, that he wanted a lawyer, or that he wanted to take a break and get some sleep.

[Petitioner] then gave a third written statement, which included *Miranda* warnings and a waiver.  In it, [Petitioner] said, "I was pushed into a corner by these people and I will now tell the truth about these incidents."  He then described how he had planned and executed the murder of Rahmouni, how he had intentionally murdered Zayed, and how he had taken a wallet and a black bag from Zayed's car after the murders.  This statement was taken at 5:13 a.m.

*Tabler v. State*, 2009 WL 4931882, at *5-6.

> b.    Counsel Was Not Deficient

Prior to trial, counsel filed a motion to suppress the statements because they were the product of an illegal arrest and because the statements "were not the result of a knowing or voluntary waiver of federal and state warnings."  1 CR 96.  At the pre-trial hearing on the motion, however, counsel essentially limited their argument to asserting that the warrantless arrest was illegal and that the confessions were therefore inadmissible as "fruit of the poisonous tree."  21 RR 77.  Petitioner contends that counsels' failure to argue other meritorious grounds

for suppression—i.e., insufficient *Miranda* warnings and coercive police conduct—constitutes ineffective assistance.  According to Petitioner, the strength of counsels' chosen argument for suppression was "immaterial to whether counsel should have raised valid, alternative bases for suppression of the statements."  (ECF No. 132 at 42).  The Court disagrees.

Trial counsel have broad discretion when it comes to deciding how best to proceed strategically.  *See Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015) (indicating counsel has "wide latitude in deciding how best to represent a client") (citing *Yarborough*, 540 U.S. at 5-6, 8).  Even when counsel focuses on certain arguments to the exclusion of others, "there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."  *Yarborough*, 540 U.S. at 8; *Trottie v. Stephens*, 720 F.3d 231, 243 (5th Cir. 2011) (holding the failure to present a particular line of argument is presumed to be the result of strategic choice).  Counsels' choice of a defense and his strategy in arguing that defense to a jury are "virtually unchallengeable."  *Strickland*, 466 U.S. at 690.  Indeed, a "conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill-chosen that it permeates the entire trial with obvious unfairness."  *Cotton v. Cockrell*, 343 F.3d at 752-53.

Following the extensive testimony of Officer Clemons and Investigator Steglich at the pre-trial hearing, counsel attempted to suppress the statements based on the fact that they were the product of a warrantless, and thus illegal, arrest.  This strategy was neither ill-chosen nor objectively unreasonable, as the evidence demonstrating Petitioner was a flight risk (the only applicable exception to the warrant requirement) was, at best, unconvincing.  *See* Texas Code of Criminal Procedure Article 14.04 (stating an offender's imminent escape to be an exception to the warrant requirement).  Although the argument was rejected by the trial court, the TCCA held

38

on direct appeal that Petitioner's warrantless arrest was illegal before concluding the statements were admissible because they were "sufficiently attenuated from the illegal arrest." *Tabler v. State*, 2009 WL 4931882, at *4-12. Thus, counsels' strategy, while ultimately unsuccessful, was reasonable under the circumstances.

Petitioner does not appear to dispute the merits of counsels' chosen argument. Instead, he faults counsel for pursuing an "all or nothing" approach and not raising other meritorious arguments for suppression. But "[t]he law does not require counsel to raise every available nonfrivolous defense." *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009). Again, there is a strong presumption that counsels' focus on certain arguments to the exclusion of others is a strategic choice rather than neglect. *Yarborough*, 540 U.S. at 8. Given the wide latitude afforded to counsel in deciding how best to represent their client, Petitioner fails to demonstrate counsels' chosen strategy to suppress his statements constitutes deficient performance under *Strickland*.

   c. <u>No Prejudice</u>

Even assuming counsel was deficient for arguing only one theory in support of suppressing the statements, the results of the proceedings would not be different because Petitioner's alternative arguments—that the statements were obtained without sufficient *Miranda* warnings and were the product of coercive police questioning—are without merit. *See Richter*, 562 U.S. at 111-12 (stating the "likelihood of a different result must be substantial, not just conceivable.").

Petitioner first contends that his initial statements to Officer Clemons at the Killeen Police Department after he was arrested were obtained in violation of his Fifth Amendment rights. According to Petitioner, he was interrogated about the murders for over forty-five

minutes before he was advised of his *Miranda* rights.  The Supreme Court has stated that

*Miranda* warnings are required when (1) a suspect is in custody and (2) is subjected to

interrogation.  *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).  There is no doubt Petitioner was

"in custody" for *Miranda* purposes following his arrest for theft.  However, the record

contradicts Petitioner's assertion that he was interrogated on the murder charge, indicating

instead that Petitioner spontaneously volunteered information about the murders to Officer

Clemons immediately after being informed he was under arrest for theft.  *See Tabler v. State*,

2009 WL 4931882, at *5 (indicating Petitioner volunteered information and that Officer

Clemons did not interrogate Petitioner at the time).  Because Petitioner's pre-*Miranda* statements

were voluntary and not the result of a custodial interrogation, Petitioner was not prejudiced by

trial counsels' failure to challenge their admissibility on these grounds.  *See Miranda*, 440 U.S.

at 478 (holding that "[v]olunteered statements of any kind are not barred by the Fifth

Amendment[.]"); *Miller*, 714 F.3d at 904 n.6 (counsel is not required to make futile motions or

objections).

Next, Petitioner contends the *Miranda* warnings he was eventually given were

insufficient to protect his rights because he had already been questioned by Officer Clemons.  In

support of his claim, he relies upon *Missouri v. Seibert*, 542 U.S. 600 (2004).  In *Seibert*, the

police diluted the effect of *Miranda* warnings through a two-step strategy: a detective

"exhaustively questioned" the suspect until securing a confession and then, after a brief break,

delivered the *Miranda* warnings and had the suspect repeat the earlier confession. *See Bobby v.*

*Dixon*, 565 U.S. 23, 30 (2011) (citing *Seibert*, 542 U.S. at 604–606, 616).  By finding the post-

warning confession inadmissible, the *Seibert* Court addressed a specific concern: "the strategy of

withholding *Miranda* warnings until after interrogating and drawing out a confession."  542 U.S.

at 609; s*ee also United States v. Montalvo–Rangel*, 437 F. App'x 316, 319 (5th Cir. 2011)

(stating that *Seibert* condemned a "question first" police tactic, "a strategy by which officials

interrogate an individual without administering a *Miranda* warning, obtain an admission,

administer a *Miranda* warning, and then obtain the same admission again").

Petitioner's reliance on *Seibert* is misplaced.  While police exhaustively questioned

Seibert until she confessed to murder prior to giving her *Miranda* warnings, Petitioner was

neither interrogated about the murder nor did he offer any incriminating information prior to

being *Mirandized*.  To the contrary, after being arrested for theft, Petitioner spontaneously

volunteered that it was Tim Payne who committed the murders and then told the details to

Petitioner, a story Petitioner maintained in his first written statement.  Petitioner did not confess

to the murders until his third written statement, well after being *Mirandized* on three different

occasions.  Because Petitioner has not shown that his constitutional rights were violated by the

same "question first, warn later" procedure condemned in *Seibert*, he has also not demonstrated

that counsel were ineffective for raising such a challenge at the suppression hearing.

Finally, Petitioner contends counsel had valid grounds to suppress each of the statements

because they were all the product of police coercion.  Specifically, Petitioner contends:

(1) Officer Clemons and Investigator Steglich employed tactics designed to overbear his will,

including interrogating him for over six hours, refusing to accept any statement that he was not

the shooter, standing a foot in front of him and physically intimidating him, and wearing him

down until he admitted guilt; (2) Officer Clemons and Investigator Steglich induced his

statements by telling him he would be released if he gave information about the murders; (3) he

has a history of mental health disorders and confessing to crimes he did not commit; and

(4) counsel had ample opportunity to challenge the credibility of the officers at the suppression

hearing.  Taking all these factors into consideration, Petitioner argues, his statements were involuntary and thus inadmissible.

An individual may waive his right against self-incrimination, if done so "voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444.  Two relevant inquiries determine whether an accused has voluntarily and knowingly waived his Fifth Amendment privilege against self-incrimination.  First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  Second, the waiver or relinquishment must be made with full awareness of the nature of the right being waived.  *Id*.  In making these inquiries, the court must consider the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

The record in this case demonstrates that the factors mentioned by Petitioner did not impede his ability to make a knowing, intelligent, and voluntary waiver of his rights.  While Detective Steglich admitted he pressured Petitioner to be more forthcoming and, at one point, stood about a foot away, such tactics do not constitute coercive or oppressive behavior that would render a confession involuntary.  Petitioner's interrogation at the Bell County Sheriff's Office lasted only five hours, during which Petitioner was given refreshments and bathroom breaks.  Both Steglich and Clemons denied that Petitioner was threatened, coerced, or promised anything in exchange for his confession during this time.  Petitioner was informed of his *Miranda* rights on three separate occasions, appeared to understand them, and signed a waiver of these rights when he gave his second and third statements.  At no time did he give any indication that he did not understand those rights or that he wanted to stop the questioning.  In sum,

Petitioner's verbal and written confirmation that he understood his *Miranda* rights, along with his willingness to be interviewed, establish that he made a knowing, intelligent, and voluntary waiver of his *Miranda* rights.

Petitioner suggests his statements were involuntary because of a long history of mental health disorders and confessing to crimes he did not commit.  Although mental state or condition may be a significant factor in the voluntariness determination, "this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'"  *Carter v. Johnson*, 131 F.3d 452, 462 (5th Cir. 1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)).  In *Connelly*, the Supreme Court explained that the sole concern of the Fifth Amendment and *Miranda* is government coercion, and not the "moral and psychological pressures to confess emanating from sources other than official coercion."  479 U.S. at 169 (citing *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).  Thus, the Court determined that "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."  *Id*. at 164.

Assuming for the moment that Petitioner was mentally unstable at the time of his confession, he still fails to identify any impropriety or undue influence by the police that would have rendered his confession involuntary.  Indeed, the record is bereft of any persuasive evidence that Petitioner's confessions were not "the product of a free and deliberate choice" but rather the result of overly coercive police tactics.  *Berghuis*, 560 U.S. at 382-83.  As a result, the Court concludes that Petitioner's allegations are "insubstantial" and do not warrant the application of the *Martinez* exception to the procedural default doctrine.  *Martinez*, 566 U.S. at 14.

3.     __Impeachment of Kimberly Geary__ (Claim I(D))

Petitioner next contends counsel were ineffective for failing to impeach the guilt/innocence and punishment phase testimony of State's witness Kimberly Geary.  At guilt/innocence, Geary testified that she met Petitioner at a nightclub about a week before the murders of Mohamed–Amine Rahmouni and Haitham Zayed and brought Petitioner home with her.  23 RR 155-82.  Although it was only meant to be a one night stand, Petitioner essentially moved into the home uninvited and stayed there with Geary and several of her roommates, including Tim Payne.  On the night of the murders, Petitioner and Payne returned home early in the morning, entered Geary's bedroom, and awakened her.  Petitioner told Geary "that he had just killed two guys," then showed her a videotape of the murders.  Geary then testified as follows:

> I saw in the back of the white Eclipse, and I saw the passenger door open and I saw [Petitioner] grab the passenger from the car and throw him on the ground.  I saw the passenger put his arm up, showing that he was still alive.  And then I saw [Petitioner] about maybe two feet away from him, shoot him right in the head, saying "who has the power now."

23 RR 165.  Petitioner destroyed the videotape the next day and threatened to kill everybody in the house if Geary told anyone.

The State recalled Geary to testify at the punishment phase regarding her knowledge of the murders of Amanda Benefield and Tiffany Dotson.  26 RR 137-55.  According to Geary, Petitioner boasted that he killed Benefield and Dotson because "they were going around saying that he was the one who killed [Rahmouni and Zayed] . . . and he had to take care of them."  *Id*. at 141.  Petitioner seemed "proud" of the murders and explained to her how he did it:

> He said he shot the driver first, which was Tiffany.  And then [Amanda] was next—next to her friend and then he said he shot her a few times in the head.  And then he made sure Tiffany was dead by touching her and shot her again.

*Id*. at 142.  Geary believed Petitioner because she had seen the videotape of his previous

murders.  *Id.*

Petitioner argues counsel were ineffective at both stages of trial for failing to adequately

challenge Geary's credibility.  According to Petitioner, effective counsel would have cross-

examined Geary on the following issues: (1) her drug use and whether she was under the

influence of heroin, alcohol, and Zoloft during the relevant time periods; (2) her alleged bias in

favor of Tim Payne; and (3) her motive to testify favorably for the State, given she "was facing

significant criminal liability at the time she provided information to police."  (ECF No. 132 at

49).  Had counsel confronted Geary about these issues, Petitioner asserts, they could have argued

at closing that Geary was not worthy of belief.  Petitioner's allegation does not meet either prong

of the *Strickland* analysis.

To support his allegation concerning Geary's alleged drug use and bias toward Tim

Payne, Petitioner states that effective counsel would have "interviewed witnesses" and

investigated a statement given to police by John Yarbrough, a man incarcerated with Tim Payne

shortly after Payne was arrested for the instant murders.[17]  Petitioner fails, however, to provide a

single witness, including Yarbrough, who was available to testify regarding Geary's alleged drug

use and bias.  Complaints of uncalled witnesses are not favored on federal habeas review because

allegations of what a witness would have testified to are largely speculative.  *Day v. Quarterman*,

566 F.3d 527, 538 (5th Cir. 2009).  To prevail on such an IATC claim, a petitioner must name

the witness, demonstrate the witness was available to testify, delineate the content of the

witness's proposed testimony, and show the testimony would have been favorable to the defense.

*Id*. at 538.  Because Petitioner fails to name a witness who was available and willing to testify

---

[17]  In his statement, Yarbrough contends he befriended Payne while playing cards together and that Payne
told him, among other things, that he had a sexual relationship with Geary and that she had used heroin
one night while they were together.  (ECF No. 90-7 at 99).

about Geary, his allegations about her alleged drug use, bias, and motive are tantamount to sheer speculation and do not warrant relief.

Even if Yarbrough had indicated a willingness to testify on Petitioner's behalf, his testimony—based on the contents of his statement to police—would have been far more damaging than helpful to Petitioner's case.  Yarbrough's statement to police essentially corroborated Petitioner's confession and the State's case against him: Petitioner lured Rahmouni with the promise to sell him stereo equipment and then shot both Rahmouni and "the guy that was with him;" Payne videotaped Petitioner shooting Rahmouni in the head and later showed the video to Geary before destroying it; Petitioner had a mental list of different people who needed to be killed; Petitioner and Payne lured Benefield and Dotson out to the lake with the promise of drugs where Petitioner shot them several times; and Geary "knew every detail of the murders." (ECF No. 90-7 at 96-101).  Thus, counsels' failure to call Yarbrough as a witness, even if he could establish Geary's drug use or bias, does not constitute deficient performance, nor was Petitioner prejudiced as a result.

Regardless, a thorough review of the record indicates counsel provided effective cross-examination on several issues, including Geary's credibility as a witness.  At the guilt/innocence phase, Geary testified that, on the night Rahmouni and Zayed were murdered, there was a party at her house where alcohol and drugs were consumed.  23 RR 162.  Geary stated she had been drinking but did not do any drugs.  *Id*.  On cross-examination, counsel questioned Geary extensively on her activities that night and established that she had been drinking on the night of the murders, that she usually drank alcohol every day, and that she did not take drugs that night because she was taking Zoloft for her anxiety.  *Id*. at 175-78.  Although she denied it, counsel repeatedly asked Geary if she had consumed drugs that evening.  *Id*. at 176-80.

The record further indicates that any assertion Geary was biased toward Tim Payne is, at best, speculative.  On direct examination, Geary established that Payne was with Petitioner when he showed her the videotape of the murder, that Payne was the one who did the recording, and that Payne was covered in a lot of blood.  *Id*. at 164-67.  On cross-examination, counsel established Payne "had a whole lot more blood" on him than Petitioner when they returned to Geary's house.  *Id*. at 182.  It is thus unclear how Geary's testimony can now be seen, in hindsight, as favoring Payne over Petitioner given that her testimony implicated both Petitioner and Payne in a capital murder.  As such, counsel was not ineffective for failing to raise the issue.

Similarly, counsel was not ineffective for failing to suggest Geary had a motive for testifying favorably for the State due to the fact she had not reported the above activities to the police and that police recovered narcotics and the murder weapon from her home.  Although Petitioner implies Geary was under investigation for these events, he provides no evidence to support this implication.  Such a conclusory allegation does little, if anything, to establish that counsel performed deficiently.  *See Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (holding "mere conclusory allegations do not raise a constitutional issue in a habeas proceeding"); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990) (same).  Consequently, Petitioner fails to establish that counsels' cross-examination of Geary was deficient or that results of the proceeding would have been different had counsel conducted the cross-examination differently.  *Strickland*, 466 U.S. at 694.  Petitioner's allegation is therefore insubstantial and does not warrant habeas relief.

### 4. <u>**Investigation and Preparation**</u> **(Claims II(A) and II(B))**

Petitioner's next two claims for relief allege that trial counsel were ineffective for failing to investigate and present mitigating evidence to the jury at the punishment phase of trial.  In Claim II(A), Petitioner contends counsel failed to conduct an adequate investigation of his

background and mental health that would have uncovered congenital birth defects and provided

firsthand accounts of his chaotic childhood.  Had they done so, Petitioner attests, counsel could

have presented testimony from "brothers, friends, boyfriends, girlfriends, teachers,

administrators, and others" regarding Petitioner's upbringing and called experts in Klinefelter's

Syndrome (KS), Fetal Alcohol Spectrum Disorder (FASD), neuropsychology, and psychiatry to

explain his multiple mental health disorders.  (ECF No. 90 at 224).  Because counsels'

investigation was limited to only a "narrow set of sources," Petitioner contends the jury received

"a misleadingly sanitized picture of his background."  *Id*. at 216, 222.

Petitioner expounds on this allegation in Claim II(C), arguing counsel consulted and

called other mental health experts to testify without providing them with the results of an

adequate mitigation investigation.  As a result, the experts were left to "fish in the dark" for

Petitioner's history, and important medical disorders (KS, FASD) and mental health disorders

(borderline personality, bipolar) either went undetected or were underdeveloped.  *Id*. at 224.

Neither of Petitioner's allegations is substantial pursuant to *Strickland* and *Martinez*.

a.   Applicable Law

Under *Strickland*'s familiar two-prong test, Petitioner must demonstrate counsels'

performance was deficient and this deficiency prejudiced his defense.  466 U.S. at 687-88, 690.

In preparing for the penalty phase of a death penalty trial, "counsel must either (1) undertake a

reasonable investigation or (2) make an informed strategic decision that investigation is

unnecessary."  *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013).  Counsel must, at

minimum, interview potential witnesses and make an independent investigation of the facts and

circumstances of the case.  *Kately v. Cain*, 704 F.3d 356, 361 (5th Cir. 2013).  But counsel

generally need not go "looking for a needle in a haystack," especially when they have "reason to

doubt there is any needle there." *Maryland v. Kulbicki*, 136 S. Ct. 2, 4-5 (2015) (per curiam) (quoting *Rompilla v. Beard*, 545 U.S. 374, 389 (2005)). Instead, counsels' decision not to investigate a particular matter "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins v. Smith*, 539 U.S. 510, 522 (2003). When the omission alleged is failing to investigate something in particular, a court must look at "the known evidence" and whether it "would lead a reasonable attorney to investigate further." *Id.* at 527.

In reviewing such claims, it is also important to remember that counsels' performance need not be optimal to be reasonable. *Richter*, 562 U.S. at 104; *Yarborough*, 540 U.S. at 8 (per curiam) (finding a defendant is entitled to "reasonable competence, not perfect advocacy."). "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Richter*, 562 U.S. at 110. For this reason, every effort must be made to eliminate the "distorting effects of hindsight," and there is a strong presumption that an alleged deficiency "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

b.   Counsels' Performance Was Not Deficient

Contrary to Petitioner's assertion, there is no evidence suggesting trial counsel conducted a less than a reasonable investigation into Petitioner's background and mental health. Counsel were assisted in their investigation at various points by a fact investigator (Bob Harrell) and two mitigation specialists (Pamela Stites and Gerald Byington). The record makes clear that the defense team obtained and reviewed a significant amount of records[18] as part of their

---

[18] These records include, but are not limited to, records from the Psychiatric Medical Group, the Lee Memorial Health System, the Emanuel Medical Center, the Doctors Medical Center, the Stanislaus

investigation, and conducted interviews, either by phone or in person, with Petitioner and

Petitioner's mother, father, and sister.  Counsel also obtained the services of three experts who

testified at trial:  Dr. Meyer Proler (clinical neurophysiology), Dr. Susan Stone (psychiatry), and

Dr. Deborah Jacobvitz (psychology).[19]  In addition, counsel consulted to an uncertain degree

with at least four experts who did not testify at trial:  Craig Schweitzer (associate of Dr. Proler),

Dr. William Lee Carter (psychology), Dr. Steve Mark (psychiatry), and Dr. Brock Morris

(psychiatry).

As a result of their investigation, counsel presented a substantial mitigating case during

the punishment phase of Petitioner's trial, including the following: (1) testimony from

Petitioner's mother and sister about his difficult childhood, potential birth trauma, problems in

school, mental instability, and history of psychiatric issues; (2) testimony from Dr. Proler

concerning an abnormality of the left temporal frontal region of Petitioner's brain that causes

difficulty in planning, relating to others, and weighing the consequences of one's actions;

(3) testimony from Dr. Stone that Petitioner was neglected and abandoned as a child, had a

history of head injuries, suffered from a severe case of ADHD, and was diagnosed with bipolar

disorder and borderline personality disorder, all of which inhibited his ability to rationally assess

situations and control his impulses; and (4) testimony from Dr. Jacobvitz regarding Petitioner's

history of parental neglect and abandonment that could have resulted in behavioral or emotional

---

Behavioral Health Center, the Ruth Cooper Behavioral Health Center, the Adventist Medical Center,
Turlock Family Services, the Atascadero State Mental Hospital, the Corcoran State Hospital, and the
Oregon Health and Science University.  They also include California Department of Corrections records,
Lee County Sheriff's Department records, Bell County records, Michigan court documents, school
records, and letters from Petitioner's father, Robert Tabler.  (ECF No. 90-1 at 68-88; ECF No. 90-12 at 6,
38-42).

[19]  Both Dr. Stone and Dr. Jacobvitz reviewed volumes of Petitioner's medical, school, and criminal
records, and Dr. Jacobvitz interviewed Petitioner and his family.

problems, a lack of conscience, or an inability to empathize with other people.  *See* Background, Section II(B), *supra*.  All of this evidence supported counsels' stated intention to demonstrate Petitioner had never been "normal" and was therefore undeserving of a death sentence.

Petitioner does not contend this strategy was deficient; rather, he argues counsel were deficient in implementing it by conducting an unreasonably limited investigation into Petitioner's neglected and chaotic upbringing.  According to Petitioner, there were dozens of other witnesses who could have testified about Petitioner's upbringing and his "impaired ability to negotiate the world and cope with its challenges."  As mentioned previously, however, complaints of uncalled witnesses are disfavored as means of establishing an IATC claim, in part because allegations of what a witness would have testified are largely speculative.  *Day v. Quarterman*, 566 F.3d at 538.  To prevail on an IATC claim based on counsels' failure to call a witness (either a lay witness or an expert witness), the petitioner must name the witness, demonstrate the witness was available to testify, delineate the content of the witness's proposed testimony, and show the testimony would have been favorable to the defense.  *Gregory v. Thaler,* 601 F.3d 347, 352 (5th Cir. 2010); *Day*, 566 F.3d at 538.

Petitioner fails to do so.  Instead, he offers only the social history report compiled by his current mitigation specialist, Colleen Francis.  (ECF No. 90-5 at 31-76).  In her report, Ms. Francis summarizes into a single narrative various hearsay statements allegedly made by approximately sixty individuals she interviewed regarding Petitioner's family, childhood, development, education, drug and alcohol use, mental health, and head injuries.  However, neither Ms. Francis nor Petitioner's current counsel provide a single affidavit from one of these witnesses, much less delineate in any meaningful way the content of each source's proposed testimony or whether those sources were available and willing to testify at trial.  As a result,

51

Petitioner's allegations concerning the multitude of individuals counsel could have called to testify is tantamount to sheer speculation and does not establish that counsels' performance was deficient in any way.

Petitioner attempts to get around this dilemma by arguing that a more thorough investigation could have informed counsels' mental health presentation by leading to the discovery of important medical disorders such as KS and FASD, and by providing corroboration for Petitioner's mental disorders, including his borderline personality and bipolar disorder. To support this argument, Petitioner does provide affidavits from several experts concerning their respective diagnoses. *See, e.g.,* ECF No. 90-6 at 30-74 (affidavit of Dr. Natalie Brown stating that certain red flags existed at the time of Petitioner's trial which indicated a strong possibility of FASD); 90-7 at 18-21 (affidavit of Professor Carole Samango-Sprouse indicating Petitioner was recently diagnosed with KS); 36-56 (affidavit of Dr. Julian Davies confirming the diagnoses of FASD and KS in Petitioner). But again, none of these experts indicate that they were available and willing to testify to the contents of their affidavits at Petitioner's trial. *See Day*, 566 F.3d at 538 (applying the uncalled-witness requirements to both lay and expert witnesses).

Even if the experts were available and willing to testify in this case, this Court rejects Petitioner's implication that trial counsel were obligated to hire additional experts to find previously undiagnosed medical disorders (such as KS and FASD) or to corroborate Petitioner's other diagnosed mental health disorders. *Strickland* does not require counsel to "canvass[] the field to find a more favorable defense expert." *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000). To the contrary, counsel were entitled to rely on the opinions of their own mental health experts in deciding what defensive theories to pursue. *See Segundo v. Davis*, 831 F.3d 345, 352 (5th Cir. 2016) ("Counsel should be permitted to rely upon the objectively reasonable

evaluations and opinions of expert witnesses without worrying that a reviewing court will

substitute its own judgment . . .") (quoting *Smith v. Cockrell*, 311 F.3d 661, 676-77 (5th Cir.

2002), *overruled in part on other grounds*, *Tennard v. Dretke*, 542 U.S. 274 (2004)); *see also*

*Turner v. Epps*, 412 F. App'x 696, 704 (5th Cir. 2011) (unpublished) ("While counsel cannot

completely abdicate a responsibility to conduct a pre-trial investigation simply by hiring an

expert, counsel should be able to rely on that expert to alert counsel to additional needed

information . . .").

      The record makes clear that Petitioner's trial counsel obtained the services of a mitigation

specialist, fact investigator, and three mental-health experts.  These experts conducted multiple

interviews with Petitioner and his family, reviewed voluminous school and medical records,

conducted EEG testing, and performed a psychological evaluation of Petitioner.  None of the

experts retained by trial counsel indicated that they were missing information needed for an

accurate diagnosis.  Although Petitioner speculates that his medical disorders might have been

discovered had counsel conducted an adequate investigation and provided the experts with an

accurate social history, such a statement is doubtful given that none of the numerous school and

health care professionals who have evaluated Petitioner over the years have ever diagnosed

Petitioner with these conditions or even suggested further testing was necessary.  Because there

was no "objective indication" that further investigation was necessary or even desirable, counsel

will not be labeled deficient for failing to pursue this avenue of mitigation.  *See Richter*, 562

U.S. at 107 (although "hypothetical experts" might be useful, counsel is entitled to "formulate a

strategy that was reasonable at the time and to balance limited resources in accord with effective

trial tactics and strategies."); *see also Earp v. Cullen*, 623 F.3d 1065, 1076-77 (9th Cir. 2010)

(finding that an expert's "failure to diagnose a mental condition does not constitute ineffective

assistance of *counsel*, and [Petitioner] has no constitutional guarantee of effective assistance of experts") (emphasis in original).

      c.    <u>Petitioner Was Not Prejudiced</u>

Even assuming counsel were deficient in not investigating further, Petitioner fails to demonstrate prejudice under the second prong of *Strickland*.  For mitigation-investigation claims such as these, a federal habeas court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Trevino v. Davis*, 861 F.3d 545, 549 (5th Cir. 2017) (citing *Wiggins*, 539 U.S. at 534).  *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that, but for counsels' deficient investigation, the result of the punishment phase of a trial would have been different.  *Wong v. Belmontes*, 558 U.S. at 27 (citing *Strickland*, 466 U.S. at 694).  "The likelihood of a different result must be substantial, not just conceivable." *Brown v. Thaler*, 684 F. 3d 482, 491 (5th Cir. 2012) (citing *Richter*, 562 U.S. at 112).  Petitioner has not made this showing.

Petitioner faults counsel for not uncovering certain details concerning his chaotic childhood and developmental problems that is now contained in Colleen Francis's social history report.  But much of what is contained in Ms. Francis's report is not new—rather, it is of the same genre as that presented to the jury at trial.  For instance, evidence that Petitioner (1) was often unsupervised and cared for mainly by his older sister; (2) had an abusive and neglectful mother; and (3) exhibited inappropriate social reactions, erratic behavior, suicidal ideation, and classic symptoms of ADHD during his childhood all were presented at length by Petitioner's mother and sister, as well as through the expert testimony of both Dr. Stone and Dr. Jacobvitz. *See* Background, Section II(B), *supra*.  Petitioner's difficulty in school and developmental

impairment, including evidence that Petitioner may have suffered from brain damage at an early age, was also discussed extensively by defense witnesses, including Dr. Proler, Dr. Stone, and his sister. *Id.* While Ms. Francis's report undoubtedly provides more details, any additional testimony regarding Petitioner's chaotic childhood and developmental issues would have been cumulative of evidence already presented at trial. *See Skinner v. Quarterman*, 528 F.3d 336, 345 n. 11 (5th Cir. 2008) (finding any IATC claim must falter "where the evidence to be discovered is so similar and cumulative that failure to find and present it would not prejudice the result") (citation omitted).

Similarly, Petitioner contends counsel should have secured appropriate medical evaluations during their investigation which would have led to, among other things, discovering that Petitioner was born with KS and FASD. Citing the report of Professor Samango-Sprouse, an expert in KS, Petitioner states that multiple behavioral manifestations and central nervous dysfunctions occur in individuals with KS, including decreased impulse control, heightened anxiety, mood lability, low frustration tolerance, depression, and executive functioning impairment. (ECF No. 90 at 96). Persons suffering from FASD display certain similar characteristics, including an inability to complete tasks or control impulses, severe attention deficits, learning disabilities, complex mental health problems, and poor social skills. *Id.* at 99-106. Because they did not consult with experts in these fields, Petitioner argues, counsel (and therefore the jury) were left with an inaccurate and incomplete explanation for why Petitioner was unable to "regulate his conduct, control his emotions, relate to others normally, pay attention, or succeed in school." *Id.* at 233.

Although no evidence was presented that Petitioner was born with KS or FASD, the jury was not left without an explanation for Petitioner's inability to control his behavior. Dr. Proler

testified Petitioner likely suffered from brain damage which impaired his ability to predict, plan, and to comprehend the meaning of words and their emotional content.  *See* Background, Section II(B), *supra*.  Dr. Stone corroborated this testimony and added that the damage was to the part of Petitioner's brain that normally regulates a person's ability to control impulses and react appropriately.  *Id*.  Dr. Stone also testified that Petitioner's severe ADHD, bipolar disorder, and borderline personality disorder caused his mood swings and impaired his ability to control his impulses and rationally assess circumstances.  *Id*.  She concluded by stating that the combination of these issues "resulted in a real inability for [Petitioner] to rationally assess situations and to use good judgment, to abstract from his mistakes and to control his impulses."  *Id*.  Thus, any testimony to that effect—whether from an expert in KS and FASD, or some other mental health professional—would have been largely redundant.  "[A]ny ineffective assistance claim must falter where the evidence to be discovered is so similar and cumulative that failure to find and present it would not prejudice the result."  *Trottie*, 720 F.3d at 246-47 (citing *Skinner*, 528 F.3d at 345 n. 11).

Regardless, when the "totality of available mitigating evidence" is weighed against the aggravating evidence presented at trial, it is clear Petitioner was not prejudiced from any alleged deficiencies in counsels' investigation.  *Trevino*, 861 F.3d at 549; *see also Strickland*, 466 U.S. at 698 (finding no prejudice due to State's overwhelming evidence on aggravating factors supporting the death penalty).  Indeed, in cases such as this where "the evidence of [ ] future dangerousness was overwhelming . . . it is virtually impossible to establish prejudice."  *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) (citing *Strickland*, 466 U.S. 698); *see also Busby v. Davis*, 925 F.3d 699, 726 (5th Cir. 2019) (stating that though mitigation evidence may not have been presented "as effectively as it might have been," a petitioner could not show prejudice when

the jury heard evidence regarding an unstable childhood and the "State's case on punishment was strong") (citing *Parr v. Quarterman*, 472 F.3d 245, 258 (5th Cir. 2006)).

As detailed in the background section of this opinion, Petitioner confessed to the premeditated murders of Mohamed–Amine Rahmouni and Haitham Zayed over a previous conflict Petitioner had with Rahmouni.  Petitioner lured the two men to an isolated area with the promise to sell Rahmouni some cheap stereo equipment then shot both victims at close range.[20] A few days later, Petitioner did the same thing to Amanda Benefield and Tiffany Dotson for allegedly spreading word of Petitioner's crime.  Petitioner admitted to luring Benefield and Dotson to a lake with the promise of drugs before shooting them both multiple times with the same gun used to murder Rahmouni and Zayed.  Petitioner bragged about the murders to his friend and showed her a video of the first murders.  He also taunted police about the killings and threatened to murder the rest of the Teazers' employees if police did not close the club.

In addition, the jury heard extensive evidence concerning Petitioner's history of threatening law enforcement officers and their families.  Among other examples, Petitioner threatened a parole officer and his family after Petitioner was arrested for a parole violation, and threatened the family of a Michigan police officer if the officer did not stop investigating him for an alleged home invasion.  The jury also heard the testimony of Dr. Richard Coons, a forensic psychiatrist who diagnosed Petitioner as having antisocial personality disorder (ASPD).  According to Dr. Coons, Petitioner displayed almost all of the traits associated with ASPD,

---

[20]  While, by their nature, all capital murder cases involve terrible circumstances, Supreme Court precedent plainly anticipates that the severity of the crime is a relevant factor in *Strickland* prejudice.  *See Smith v. Spisak*, 558 U.S. 139, 154-55 (2010); *Strickland*, 466 U.S. at 699; *see also Vasquez v. Thaler*, 389 F. App'x 419, 428 (5th Cir. 2010) (unpublished) ("Naturally, the power of the newly amplified case to mitigate a jury's selected punishment will be contingent on other factors in the case, such as the circumstances of the crime."); *Carty v. Thaler*, 583 F.3d 244, 263 (5th Cir. 2009) ("In this re-weighing, the brutality of the crime is relevant but does not automatically trump additional mitigating evidence.").

including a pervasive pattern of disregard for the rights or feelings of others at an early age,

deceit, manipulation, impulsivity, and indifference to the consequences of his actions.  Dr. Coons

explained that people with ASPD used to be termed psychopaths, do not have much of a

conscience, and "do what [they] want to do because [they] want to do it," not because they lack

free will.

Given the strength of the overwhelming evidence establishing Petitioner's future

dangerousness, Petitioner fails to establish the result would have been different had counsel

discovered the evidence in question.  *See Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir.

1989) (finding no ineffective assistance "[g]iven the weakness of such testimony when

juxtaposed with the overwhelming evidence of guilt, the horrifying nature of the crime, and the

abundant impeachment material available to the State").  Petitioner was therefore not prejudiced

by counsels' allegedly deficient mitigation investigation.

        d.    <u>Summary</u>

Petitioner contends that counsel "deficiently implemented their own strategy" of showing

that he was "not normal" by conducting an unreasonably limited investigation into his

upbringing and congenital birth defects.  But "[t]he defense of a criminal case is not an

undertaking in which everything not prohibited is required.  Nor does it contemplate the

employment of wholly unlimited time and resources."  *Smith v. Collins*, 977 F.2d 951, 960 (5th

Cir. 1992).  Although it is tempting, in hindsight, to observe that counsel could have investigated

more, hired different experts, or presented more mitigating witnesses, this Court is "particularly

wary of arguments that essentially come down to a matter of degrees.  Did counsel investigate

enough?  Did counsel present enough mitigating evidence?  Those questions are even less

susceptible to judicial second-guessing." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt*, 230 F.3d at 743) (internal quotation marks omitted)).

In this case, the objective evidence present in the record demonstrates counsel conducted a broad investigation into Petitioner's background and mental health and presented a thorough case for mitigation. Petitioner provides little persuasive evidence to the contrary, and the evidence he has presented is, for the most part, cumulative of the evidence already adduced at trial. Moreover, Petitioner's evidence does not come close to outweighing the substantial evidence presented by the State regarding Petitioner's responsibility for four murders and history of threatening law enforcement officers and their families. *See Busby*, 925 F.3d at 726 (finding evidence "of the same genre as that presented to the jury at trial" could not outweigh the State's "overwhelming" evidence of future dangerousness) (citing *Newbury v. Stephens*, 756 F.3d 850, 873-74 (5th Cir. 2014)). Consequently, Petitioner fails to demonstrate either deficient performance or prejudice as required under *Strickland*, rendering Petitioner's allegations insubstantial and without merit.

### 5.    <u>Preparation of Expert Witnesses</u> (Claim II(C))

In his next allegation, Petitioner contends that counsels' deficiencies regarding their handling of expert witnesses was not limited to failing to provide them with the results of an adequate social history investigation. According to Petitioner, counsel also failed to adequately prepare the experts to testify with the records that were in counsels' possession, failed to object to irrelevant and prejudicial cross-examination, and failed to rehabilitate the witnesses with available evidence following the State's cross-examination. Similar to the previous allegation, Petitioner's argument is based on exactly the type of second-guessing and hindsight that

*Strickland* prohibits.  466 U.S. at 689-90 (finding "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence").

The questioning of witnesses and the presentation of evidence are inherently matters of trial strategy when such choices are the result of a "conscious and informed decision on trial tactics."  *Cotton*, 343 F.3d at 752.  Because decisions regarding the questioning and cross-examination of witnesses are strategic, they usually "will not support an ineffective assistance claim."  *United States v. Bernard*, 762 F.3d 467, 472 (5th Cir. 2014) (citation omitted).  To establish deficient performance, Petitioner must not only rebut the presumption that counsels' decisions were based on sound trial strategy; he must also show that counsels' performance fell below an "objective standard of reasonableness."  *Strickland*, 466 U.S. at 687-88.  But counsel will not be judged ineffective only by hindsight.  *Yarborough*, 540 U.S. at 6 ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."); *Rompilla*, 545 U.S. at 374 ("hindsight is discounted").

Here, Petitioner has been unable to resist the temptation to second-guess trial counsel with the benefit of hindsight.  Petitioner cites several examples during the testimony of Dr. Proler, Dr. Stone, and Dr. Jacobvitz where counsel seemingly could have done more to help bolster the credibility of the expert in the eyes of the jury following cross-examination by the State.  For example, counsel could have had Dr. Proler explain the differences between an "objective" EEG and a "quantitative" EEG and why his analysis was based solely on the former, and could have supported Dr. Stone's testimony about Petitioner's family life and various diagnoses (ADHD, bipolar disorder, borderline personality disorder) with records to that effect.

While additional questioning arguably could have been helpful, the record indicates it was not necessary given the substantial mitigating evidence counsel already elicited from each

expert during direct examination.  As discussed previously in this opinion, the jury heard a

considerable amount of evidence from defense experts explaining Petitioner's inability to control

his behavior, including the fact that Petitioner was neglected and abandoned as a child, likely

suffered from brain damage, and was diagnosed with severe ADHD, bipolar disorder, and

borderline personality disorder, all of which impaired his ability to control his impulses,

rationally assess circumstances, and empathize with other people.  In other words, counsels'

handling of the defense experts was reasonable and was not required to reach the level of

"perfect advocacy."  *Yarborough*, 540 U.S. at 6;  *see also Castillo v. Stephens*, 640 F. App'x

283, 292 (5th Cir. 2016) (unpublished) ("[s]peculating about the effect of tinkering with the

cross-examination questions is exactly the sort of hindsight that *Strickland* warns against").

 In any event, even assuming counsels' performance could be considered deficient for

their handling of the experts' testimony, Petitioner fails to demonstrate that the results of the

proceeding would have been different had counsel prepared and rehabilitated their experts in the

manner Petitioner now suggests.  *Strickland*, 466 U.S. at 694.  As discussed in the previous

section, the State established Petitioner was responsible for four premeditated murders, bragged

about the murders and taunted authorities afterward, and has a history of threatening law

enforcement officers and their families.  In situations such as this, where evidence of future

dangerousness is overwhelming, it is difficult to establish *Strickland* prejudice.  *Ladd*, 311 F.3d

at 360.  There is therefore no merit to Petitioner's assertion that the results of the punishment

phase would have been different had counsel prepared and rehabilitated their experts differently.

 In short, Petitioner fails to demonstrate that counsel were deficient or that the results of

the punishment phase would have been different had counsel prepared and rehabilitated their

experts as he now suggests.  Petitioner's allegation is therefore insubstantial and does not

warrant federal habeas relief.

      **6.**      <u>**Rebuttal of State's Evidence**</u> **(Claim II(D))**

Petitioner next contends trial counsel were ineffective for failing to rebut or otherwise

mitigate evidence presented by the State at the punishment phase.  Specifically, Petitioner

focuses on the testimony of Officer Jeff Hilliker, a Michigan police officer who briefly testified

about his investigation of a home burglary that took place in July 2004 where two handguns were

stolen from the home.  25 RR 39-52.  During the course of his investigation, Officer Hilliker

spoke with two of Petitioner's acquaintances, Scott Nash and Lisa Wagner, who advised him that

they had traveled to California with Petitioner that summer in a stolen truck and had seen

Petitioner in possession of similar handguns.  After obtaining Petitioner's cell phone number,

Officer Hilliker contacted Petitioner who initially denied knowledge of the handguns.  Petitioner

later called back several times and threatened the officer and his family if he did not immediately

drop the investigation.

Petitioner argues his trial counsel were ineffective because they did not require Officer

Hilliker to link the guns seen in Petitioner's possession to the ones taken in the burglary.

According to Petitioner, Nash and Wagner had no personal knowledge of the origin of the guns

seen in Petitioner's possession, thus reasonable counsel would have objected to this testimony

because "there was no foundation establish[ing] that these were the same guns stolen in a

burglary."  (ECF No. 90 at 241).  The problem with this argument is that Officer Hilliker never

explicitly stated that the weapons seen by Nash and Wagner were the same as those stolen in the

burglary he was investigating.  Moreover, the point of Officer Hilliker's testimony was that

Petitioner threatened to harm him and his family if he continued to investigate the burglary.

Thus, the impact of an objection by counsel regarding the guns would have been negligible. *Roberts v. Thaler*, 681 F.3d 597, 612 (5th Cir. 2012) ("the failure to lodge futile objections does not qualify as ineffective assistance") (quoting *Koch v. Puckett*, 907 F.2d at 527).

Petitioner also argues counsel were ineffective for failing to interview Lisa Wagner and present her testimony about her relationship with Petitioner as mitigating evidence. Again, to prevail on an IATC claim based on counsels' failure to call a witness, a petitioner must name the witness, demonstrate the witness was available to testify, delineate the content of the witness's proposed testimony, and show the testimony would have been favorable to the defense. *Day*, 566 F.3d at 538. Unsupported claims regarding an uncalled expert witness "are speculative and disfavored by this Court as grounds for demonstrating ineffective assistance of counsel." *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002).

According to a social history report compiled by Petitioner's current mitigation specialist Colleen Francis, Wagner stated that she cared deeply for Petitioner but ended their relationship because Petitioner was unstable, suffered from severe mood swings, and did not understand the consequences of his actions. (ECF No. 90-5 at 466). While arguably favorable, Petitioner fails to establish Wagner was available to testify or that her testimony would resemble what Colleen Francis wrote in her report. Although Petitioner contends Wagner "would have testified on his behalf at sentencing and asked the jury to spare his life" had she been contacted by trial counsel (ECF No. 90 at 219-20), he provides no affidavit from Wagner—only Colleen Francis's hearsay report, which, contrary to Petitioner's reassurances, lacks any indication that Wagner was available and willing to testify. Thus, Petitioner's speculative and misleading allegation fails to establish that counsel were deficient. *See Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001) (explaining that "[w]here the only evidence of a missing witnesses' testimony is from the

defendant, this Court views claims of ineffective assistance with great caution") (quoting *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986)).

Finally, even assuming counsels' performance could be considered deficient for the above reasons, Petitioner fails to demonstrate that the results of the proceeding would have been different had counsel acted differently. *Strickland*, 466 U.S. at 694. With regard to presenting Lisa Wagner as a witness, Petitioner cannot demonstrate prejudice because her proposed testimony—that Petitioner was kind and caring but also severely unstable—would largely reiterate the testimony of several other witnesses presented by counsel. *See Trottie*, 720 F.3d at 246-47 (finding IATC claim for failing to call a witness fails if the proposed testimony was cumulative of evidence already in the record); *Skinner*, 528 F.3d at 345 n. 11 (same).

Similarly, the results of Petitioner's punishment phase would not have been different had counsel objected to Officer's Hilliker's failure to establish a link between the stolen handguns and the handguns seen in Petitioner's possession because that was not the point of Hilliker's brief testimony. Rather, Hilliker's testimony established (1) that Petitioner was being investigated for a home burglary and (2) Petitioner threatened the lives of the investigating officer and his family if he did not cease the investigation, both of which the jury would have heard regardless of whether counsel successfully objected on these grounds. Moreover, Hilliker's testimony lasted a total of thirteen pages and was only a small part of the State's overwhelming evidence of Petitioner's future dangerousness. As discussed previously in this opinion, the State established that Petitioner was responsible for four premeditated murders, bragged about the murders and taunted the authorities afterward, and had a history of threatening law enforcement officers and their families. *See* Section C(4)(c), *supra*. In situations such as

this, where evidence of future dangerousness is overwhelming, it is virtually impossible to establish *Strickland* prejudice.  *Ladd*, 311 F.3d at 360.

In summary, Petitioner fails to demonstrate that counsel were deficient or that the results of the punishment phase would have been different had counsel filed the above objection or presented Lisa Wagner as a witness.  Petitioner's allegations are therefore insubstantial and do not warrant federal habeas relief.

### 7.    <u>Unadjudicated Offenses</u> (Claim II(E))

At the punishment phase of Petitioner's trial, the State presented testimony from several witnesses concerning numerous prior criminal acts committed by Petitioner which he had not been convicted of to demonstrate Petitioner was a future danger to society.  This included testimony concerning the murders of Amanda Benefield and Tiffany Dotson, Petitioner's attempt to escape custody after being arrested for a parole violation, Petitioner's potential involvement in a home invasion, and Petitioner's threats to law enforcement officials.  In Claim II(E), Petitioner claims trial counsel were ineffective for failing to object to the admission of these "unsubstantiated and unadjudicated" offenses because their admission violated his Eighth and Fourteenth Amendment rights.  Petitioner also faults counsel for not objecting to inadmissible hearsay regarding these criminal acts.[21]  Both of these allegations lack merit.

To start, Petitioner's allegation concerning unadjudicated offenses fails because he has provided no legal authority to support his assertions.  Conclusory assertions of deficient performance by trial counsel such as those contained in Petitioner's amended petition are

---

[21]  Petitioner also maintains that his appellate counsel was ineffective for not raising these issues, and others, on direct appeal.  (ECF No. 90 at 222, 225).  As stated previously in this opinion, *Martinez* is a "narrow exception" that applies only to claims alleging ineffective assistance by trial counsel.  *Martinez*, 566 U.S. at 9-18; *see also Davila v. Davis*, 137 S. Ct. at 2065 (declining to extend *Martinez* to claims alleging ineffective assistance of appellate counsel).  Because *Martinez* has no effect on the procedural default of any claims concerning appellate counsel, the Court will not address these allegations further.

insufficient to support a claim for ineffective assistance of counsel.  *Woodfox v. Cain*, 609 F.3d

774, 809 n.17 (5th Cir. 2010); *Gregory*, 601 F.3d at 353.  Perhaps the reason for this lack of

supporting authority is that the law is clear on this issue:  the "admission of unadjudicated

offenses in the sentencing phase of a capital trial does not violate the eighth and fourteenth

amendments."  *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005) (quoting *Williams v.*

*Lynaugh*, 814 F.2d 205, 208 (5th Cir. 1987); *Hughes v. Dretke*, 412 F.3d 582, 593 (5th Cir.

2005) ("[T]he Supreme Court has never held that the federal constitution requires a state to prove

an extraneous offense beyond a reasonable doubt."); *Harris v. Johnson*, 81 F.3d 535, 541 (5th

Cir. 1996) (holding that "the use of evidence of unadjudicated extraneous offenses, at the

sentencing phase of Texas capital murder trials, does not implicate constitutional concerns").

Even "[t]he introduction of evidence of extraneous offenses of which the defendant has been

acquitted is consistent with due process."  *Harris*, 313 F.3d at 246.

   Furthermore, even though there is no constitutional prohibition on the introduction of

evidence at the punishment phase showing that the defendant has engaged in unadjudicated

criminal conduct, Petitioner's jury was instructed it could only consider evidence of Petitioner's

extraneous offenses if it found beyond a reasonable doubt that he committed the offenses:

> You are instructed that there is evidence before you in this case regarding the
> Defendant having committed or participated in other acts or transactions other
> than the offense alleged against him in the indictment in this case, that you cannot
> consider such other acts or transactions, if any, unless you first find and believe
> beyond a reasonable doubt that the defendant committed or participated in such
> acts or transactions, if any, but if you do not so believe, or if you have reasonable
> doubt thereof, you will not consider such evidence for any purpose.

1 CR 270.  Petitioner's trial counsel cannot reasonably be faulted for failing to object to

admissible testimony, particularly in light of the fact that the jury received the above instruction.

*See Miller v. Thaler*, 714 F.3d at 904 n.6 (counsel is not required to make futile motions or

objections); *Roberts*, 681 F.3d at 612 ("the failure to lodge futile objections does not qualify as

ineffective assistance") (quoting *Koch*, 907 F.2d at 527).  Petitioner's claim is therefore meritless.

Petitioner also claims that trial counsel should have objected to several incidences of hearsay concerning his unadjudicated offenses.  The first was during testimony from Petitioner's former parole officer Peter Lev who, in addition to testifying about Petitioner's attempt to escape after being arrested for a parole violation, stated he was taken off of Petitioner's case because Petitioner told a social worker that he was going to "take care" of the parole agent and his family when he got out of jail.  25 RR 24-30.  The other incidents of alleged hearsay occurred during the testimony of Officer Hilliker, a Michigan police officer who testified that he was threatened by Petitioner for investigating a home invasion.  *Id*. at 39-43.  According to Petitioner, it was hearsay for Officer Hilliker to state (1) that the homeowner had advised him that guns were missing from the home, and (2) he learned from two other individuals that Petitioner had also stolen a truck from a car dealership.

Petitioner again cites no legal authority to support his conclusory assertions, much less establishes that each of the above incidences constitutes objectionable hearsay.  Even assuming the statements in question are hearsay, however, any objection by counsel would have been futile because the facts of the underlying offenses (Petitioner threatened his parole officer and stole guns and a truck) would still be admissible.  As noted by Respondent, had counsel objected to these statements as hearsay, the prosecution only had to re-ask the questions in a different manner in order to establish each of the underlying offenses.  Thus, trial counsel was not deficient in failing to file what would ultimately be a pointless objection.  *Ward v. Dretke*, 420 F.3d 479, 498 (5th Cir. 2005) (counsel not ineffective for failing to lodge what would likely have been a futile objection).

Regardless, Petitioner fails to demonstrate that the results of the proceeding would have been different had a hearsay objection been successful. *Strickland*, 466 U.S. at 694. As demonstrated in this Court's summary of the trial testimony, the most damaging aspect of Officer Hilliker's testimony was not that Petitioner stole guns and a truck, but that he threatened the lives of the officer and his family if the officer did not immediately drop his investigation. Moreover, both Hilliker and Lev's testimony were only a small part of the State's overwhelming evidence of Petitioner's future dangerousness. *See* Section C(4)(c), *supra*. There is therefore no merit to Petitioner's bald assertion that the results of the punishment phase would have been different had counsel raised the above hearsay objections.

### 8.   <u>Victim-Impact Evidence</u> (Claim II(F))

In his next IATC allegation, Petitioner contends counsel were ineffective for not objecting to the prosecution's presentation of extraneous victim-impact and victim-character evidence at the punishment phase. Petitioner references *Payne v. Tennessee*,[22] which lifted the *per se* bar against victim-impact testimony under the Eighth Amendment and delegated to the states whether to admit such evidence at sentencing. Under *Payne*, the admission of such evidence violates due process only if the evidence "is so unduly prejudicial that it renders the trial fundamentally unfair." 501 U.S. at 824-25. In Texas, victim-impact and victim-character evidence relating to a victim not named in the indictment is considered inadmissible because the danger of unfair prejudice to a defendant is "unacceptably high." *Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997) (holding that "[t]he admission of such evidence would open the door to admission of victim-impact evidence arising from *any* extraneous offense committed by a defendant.") (emphasis in original). Any error in the admission of this evidence, however, is subject to a harmless error analysis in state court. *Id*. at 637-38.

---

[22]  501 U.S. 808, 825 (1991).

In this case, the State presented victim-impact and victim-character testimony relating to Amanda Benefield and Tiffany Dotson, two victims not named in the indictment.  The State first presented the testimony of Carroll Vaughn, Amanda Benefield's grandmother, who testified that despite her violent and troubled childhood, Benefield was a "happy girl" who "loved life."  26 RR 64-71.  Vaughn believed that "all Amanda Kay ever wanted was [the] love that she never had," and thought "it's so sad the life that she lived as a brutal death that she had."  *Id*. at 71.  The State then presented the testimony of Mary Dotson, Tiffany Dotson's step-mother, who stated that her step-daughter was an "outgoing, fun-loving child," was "a big animal lover," and was "the love of our life."  *Id*. at 75-81.  Dotson stated that her step-daughter's death "was the nightmare that parents have when you let your children go out and . . . sometimes bad things happen and this is—that was the worst.  It was horrible."  *Id*. at 81.

Petitioner contends counsel were ineffective for failing to object to this extraneous victim-impact and victim-character testimony because it was inadmissible under Texas law. Like the error in *Cantu*, Petitioner asserts it was error to admit the testimony of Carroll Vaughn and Mary Dotson because their testimony concerned two victims who were not named in the indictment.  Respondent concedes that "some" of the above testimony may have been erroneously admitted without objection (ECF No. 99 at 208), and this Court agrees.  *See Cantu*, 939 S.W.2d at 637 (holding victim-impact testimony from a mother of a victim not named in the indictment is not relevant since the defendant "was not on trial for her murder and such evidence serves no purpose other than to inflame the jury.").  But the Court need not address whether counsel was deficient for not objecting to this evidence because Petitioner failed to demonstrate that he was prejudiced as a result.  *Pondexter v. Quarterman*, 537 F.3d 511, 520 (5th Cir. 2008) (finding that an IATC claim may be rejected for want of either deficient performance or

prejudice, and thus the absence of either prong of the *Strickland* analysis is dispositive) (citing *Strickland*, 466 U.S. at 697).

As in *Cantu*, any error in admitting the testimony of Carroll Vaughn and Mary Dotson was harmless beyond a reasonable doubt.  939 S.W.2d at 637 (holding that erroneous admission of extraneous victim-impact testimony at punishment was harmless where the testimony comprised fewer than 20 pages out of 700 pages of testimony, the state did not mention the testimony during argument, and the overwhelming focus during punishment phase was on Cantu's behavior and the circumstances of the offense).  The testimony of the two witnesses at issue here amounted to only 16 pages out of roughly 625 total pages of testimony and was not mentioned by the State at closing argument.  Moreover, the overwhelming focus of the State during Petitioner's penalty phase was that Petitioner was responsible for four premeditated murders, bragged about the murders and taunted the authorities afterward, and has a history of threatening law enforcement officers and their families.  *See* Section C(4)(c), *supra*.  Thus, contrary to Petitioner's assertion, the admission of the testimony "was not so unduly prejudicial that it render[ed] the trial fundamentally unfair."  *Payne*, 501 U.S. at 824-25.

For this reason, Petitioner fails to show that there was a reasonable probability that, but for counsels' failure to object, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Johnson v. Blackburn*, 778 F.2d 1044, 1050 (5th Cir. 1985) ("If an error is shown to be harmless, then the error cannot satisfy the prejudice prong of *Strickland*."). Consequently, Claim II(F) is insubstantial and does not warrant federal habeas relief.

**9.     Parole Evidence (Claim II(G))**

Petitioner contends trial counsel were ineffective for failing to develop and present evidence that, if given a life sentence, there was an extremely low probability Petitioner would

be released on parole.  To support this allegation, Petitioner provides only a one-page response

from TDCJ to an open records request indicating that, of the 1,976 offenders in TDCJ serving a

life sentence for capital murder, only five had been released to parole since 1995.  (ECF No. 90-

15 at 2).  Petitioner does not provide the name of any witness counsel could have called to testify

about this information.

Once again, to prevail on an IATC claim based on counsels' failure to call a witness

(either a lay witness or an expert witness), the petitioner must name the witness, demonstrate the

witness was available to testify, delineate the content of the witness's proposed testimony, and

show the testimony would have been favorable to the defense.  *Gregory,* 601 F.3d at 352; *Day*,

566 F.3d at 538.  Although Petitioner arguably states the content of the proposed testimony, he

fails to name a witness or demonstrate that the witness was available to testimony, much less

establish that the testimony would have been favorable to the defense.  Petitioner's IATC claim

is therefore a non-starter.

Even assuming counsel was deficient in not locating and presenting a witness to testify

about the low probability of parole, Petitioner fails to demonstrate that he was prejudiced under

the second prong of *Strickland*.  The record shows Petitioner received a jury instruction which

adequately informed the jury on Petitioner's parole eligibility if sentenced to life.[23]  Because, at

the time of his conviction, Petitioner would be eligible for parole if sentenced to life

---

[23]  The jury was instructed as follows (1 CR 271):

> Under the law applicable in this case, if the defendant is sentenced to imprisonment in the
> institutional division of the Texas Department of Criminal Justice for life, the defendant
> will become eligible for release on parole, but not until the actual time served by the
> defendant equals 40 years, without consideration of any good conduct time.  It cannot
> accurately be predicted how the parole laws might be applied to this defendant if the
> defendant is sentenced to a term of imprisonment for life because the application of those
> laws will depend on decisions made by prison and parole authorities, but eligibility for
> parole does not guarantee that parole will be granted.

imprisonment, this instruction was more than Petitioner was entitled to under federal law. *See Simmons v. South Carolina*, 512 U.S. 154, 156 (1994) (holding a jury instruction on parole eligibility is only required when state law prohibits the defendant's release on parole and the defendant's future dangerousness is at issue); *Elizalde v. Dretke*, 362 F.3d 323, 332-33 (5th Cir. 2004) (same).

Moreover, any attempt by counsel to supplement this instruction with testimony concerning the likelihood of Petitioner's parole if sentenced to life may not have been admitted by the trial court. *See Smith v. State*, 898 S.W.2d 838, 846 (Tex. Crim. App. 1995) (holding that it was not error for a trial court to refuse the admission of testimony concerning parole because parole is not a matter for a jury's consideration in a capital murder trial). Even if it were admitted, it is unlikely the results of Petitioner's punishment phase would have been different because of such testimony, particularly given the overwhelming nature of the evidence presented by the State establishing Petitioner's future dangerousness. *Strickland*, 466 U.S. at 698 (finding no prejudice due to State's overwhelming evidence on aggravating factors supporting the death penalty); *Russell*, 892 F.2d at 1213 (finding no ineffective assistance "[g]iven the weakness of such testimony when juxtaposed with the overwhelming evidence of guilt, the horrifying nature of the crime, and the abundant impeachment material available to the State").

Again, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S at 112. Petitioner has not made this showing. Thus, his complaint about trial counsels' failure to present evidence regarding the low probability of Petitioner's parole is insubstantial and fails to satisfy either prong of *Strickland* analysis.

10.   **The Prosecution's Closing Argument** (Claim II(H))

In his next claim, Petitioner alleges that the prosecution's closing argument at the punishment phase was "improper essentially from start to finish" but that counsel failed to raise a single objection. Specifically, Petitioner contends the prosecution: (1) argued facts not in evidence to ridicule defense witnesses, (2) made burden-shifting arguments that faulted the defense for not presenting certain evidence, (3) instructed the jury to ignore the defense's mitigating evidence because it did not relate directly to the underlying offense, and (4) incorrectly instructed the jury that a death sentence was required due to a lack of mitigating evidence. Because they lacked a reasonable basis for failing to raise an objection to these arguments, Petitioner asserts counsels' performance was deficient and that he likely would not have been sentenced to death had counsel performed adequately.

It is well settled that "the failure to lodge futile objections does not qualify as ineffective assistance." *Roberts*, 681 F.3d at 612; *Koch*, 907 F.2d at 527. Indeed, decisions to object or not object during closing argument are matters of trial strategy that are presumed reasonable under *Strickland*. *Wiley v. Puckett*, 969 F.2d 86, 102 (5th Cir. 1992). Thus, in order to show that counsel was deficient for failing to object under the first prong of *Strickland*, Petitioner must establish that the proposed objections would have had merit. *Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir. 2007). Generally speaking, the four proper areas for prosecutorial jury argument are summation of the evidence, reasonable inference from the evidence, answers to opposing counsel's argument, and pleas for law enforcement. *See Norris v. Davis*, 826 F.3d 821, 832 n.10 (5th Cir. 2016) (recognizing these as the four proper areas for prosecutorial argument in Texas). Because the arguments made by the prosecution clearly fell within one of these categories, counsel were not ineffective for failing to raise an objection.

       a.     <u>Facts Not in Evidence</u>

Petitioner first contends that the prosecution argued facts not in evidence to disparage two defense experts, Dr. Jacobvitz and Dr. Proler.  With regard to Dr. Jacobvitz, the prosecution made the following commentary:

> But what's her other research project?  *Her other research project features you, folks, as the guinea pigs*.  She[] was located by John Nyland with the Texas Defender Service.  He recruited her to come up here and just start rambling about childhood development and neglectful childhood and things like that in the hopes, in the hopes that you folks will say, okay, that sounds like mitigation to me, so there it is.  It's mitigating.  That way if you folks buy into that *she can get on the statewide testifying bandwagon* and travel from capital to capital trial and talk about the same things again and ignore facts and ignore evidence and not really care whether people lied to her or not.

29 RR 49-50 (emphasis added).  This statement, while critical of Dr. Jacobvitz's motivations, contains reasonable inferences from her earlier testimony.  Although she was unaware of exactly what the Texas Defender Service did, Dr. Jacobvitz's testified that she had written and conducted research projects involving her area of expertise and that, while she hadn't testified before, she thought this case was "really interesting" and would help her research.  28 RR 88-131.  It is thus a reasonable inference that she would use the outcome of this case as part of her research.  It is also reasonable to assume that, if her testimony assisted the defense in obtaining a life sentence over the death penalty, Dr. Jacobvitz might be willing to testify again, if she were asked, due to her interest in these issues.  An objection by counsel was therefore not required.

Similarly, the prosecution's questioning of Dr. Proler was not improper.  On cross-examination, the prosecution questioned Dr. Proler at length regarding the basis of his testimony in previous death penalty trials and about his failure to mention that he had also conducted a quantitative EEG on Petitioner in addition to the non-quantitative EEG which was the subject of his testimony.  *Id*. at 19-26.  During closing, the prosecution then discussed Dr. Proler's reluctance to mention the quantitative EEG:

And did Dr. Proler strike you as the kind of guy that was really out there and wanting to tell you all the information that he had?

You know, Dr. Proler, you said you did a quantitative EEG. Well, I didn't mention that.

Apparently the last case in Harris County some prosecutor apparently just skinned him and that's why he is somewhat reluctant to say of anything on the stand.

29 RR 45. Because this line of questioning was a reasonable inference from Dr. Proler's cross-examination testimony, counsel were not ineffective for not lodging an objection.

        b.     <u>Burden-shifting</u>

Petitioner next faults counsel for not objecting to the prosecution's repeated comments on the defense's failure to present Petitioner's father, Robert Tabler, as a witness. According to Petitioner, these comments violated his due process rights by shifting the burden of proof from the prosecution to the defense. But during the defense's argument, counsel repeatedly blamed Petitioner's father for how his son turned out. *See, e.g.,* 29 RR 19 (stating the "first conscious thought his father had of him was abort it."), 20 ("Can you conceive of a parent who is so detached from their child that as he's tried for capital murder the man can't come here?"), 28 ("Not getting much attention from dad."), 31 ("And when Robert Tabler says, when [Petitioner]'s first conceived, get rid of him, what does that tell you about how he's going to treat him after that?"), 32 (implying Robert had "no clue" what Petitioner was like as a child). As such, the prosecution's argument was merely a response to the argument by defense counsel attempting to place blame onto Robert Tabler without presenting him as a witness to confirm or refute the accusations. Because the prosecutor's comments were made in response to argument by opposing counsel, counsel were not ineffective for failing to object. *See Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000) ("Jury argument [in Texas] is appropriate if it falls within one of the following: (1) a summation of the evidence; (2) a reasonable deduction from

75

the evidence; (3) an answer to argument of opposing counsel; and (4) a plea for law enforcement.").

            c.     <u>Instructions to Ignore Evidence</u>

Next, Petitioner claims counsel should have objected to the prosecutor's repeated instructions to the jury to ignore mitigating evidence because it did not directly relate to the crimes for which he was convicted. Citing *Tennard v. Dretke*,[24] Petitioner contends the prosecutor's argument violated his Eighth Amendment rights because the jury was precluded from giving effect to the mitigating evidence he presented. This allegation was raised by Petitioner during his direct appeal proceedings and rejected on the merits by the Texas Court of Criminal Appeals. *Tabler v. State*, 2009 WL 4931882 *3. The allegation was also raised and rejected on the merits during Petitioner's original federal habeas proceedings by both the district court and the Fifth Circuit on appeal. ECF No. 42; *Tabler v. Stephens*, 588 F. App'x  at 308-09.

Again, the purpose of the Fifth Circuit's remand in this case is to determine whether Petitioner can establish cause under *Martinez* to excuse the procedural default of any IATC claim he could raise with the assistance of new counsel. Because this allegation has been fully adjudicated on the merits in both state and federal court, *Martinez* does not apply. *See Escamilla v. Stephens*, 749 F.3d 380, 394 (5th Cir. 2014) ("*Martinez* does not apply to claims that were fully adjudicated on the merits by the state habeas court because those claims are, by definition, not procedurally defaulted."). Even if it did, Petitioner's allegation was already rejected by Judge Smith in his 2012 Order, which was affirmed by the Fifth Circuit on appeal. Petitioner fails to provide a sufficient reason for this Court to now reconsider a claim that has already been

---

[24]  542 U.S. 274, 287 (2004).

rejected by three different courts.  Thus, Petitioner's claim does not warrant federal habeas corpus relief.[25]

          d.      <u>Incorrect Statement of Law</u>

In his last allegation concerning the prosecution's closing argument, Petitioner contends counsel were ineffective for failing to object to the prosecution's repeated instructions to the jury that they had "no choice" but to return a death sentence verdict because the defense failed to present a single mitigating circumstance.  Citing *Caldwell v. Mississippi*,[26] Petitioner states that the prosecution removed the jury's sense of responsibility for their decision by arguing that there is "nothing in evidence that excuses, explains, or more importantly mitigates what he did" and "nothing that reduces [Petitioner's] blameworthiness. . ."  29 RR 59.  Petitioner's allegation is insubstantial.

In reviewing a *Caldwell* claim, the proper inquiry is whether, under all the facts and circumstances, including the entire trial record, the state has misled the jury regarding its role under state law to believe that the responsibility for determining the appropriateness of the imposition of the death penalty rests elsewhere.  *See Dugger v. Adams*, 489 U.S. 401, 407 (1989) (finding a defendant "must show that the remarks to the jury improperly described the role assigned to the jury by local law" to establish a *Caldwell* violation).  There is nothing about the prosecution's closing argument in this case which could be rationally construed as misleading the jury regarding its ultimate responsibility for imposing the sentence of death upon Petitioner.  Indeed, a careful review of the prosecution's argument reveals that the remarks were either

---

[25]  In fact, if the Court were to review the claim again on the merits, it would have to be dismissed as successive under the plain language of the AEDPA because the claim has already been litigated on the merits in Petitioner's original habeas proceedings.  *See Williams v. Thaler*, 602 F.3d 291, 301 (5th Cir. 2010) (citing 28 U.S.C. § 2244(b)(1)).

[26]  472 U.S. 320 (1985).

reasonable deductions from the evidence presented at punishment or were proper pleas for law enforcement.  Because both of these are proper areas for prosecutorial jury argument, counsel was not deficient for lodging what would have been a futile objection.  *Roberts*, 681 F.3d at 612.

          e.    <u>No Prejudice</u>

Alternatively, even assuming the foregoing arguments were improper, Petitioner fails to demonstrate prejudice under the second prong of *Strickland*.  For a reviewing court, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "Such unfairness exists 'only if the prosecutor's remarks evince either persistent and pronounced misconduct or . . . the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred.'"  *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002) (quoting *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985)).  Petitioner fails to make this showing as well.

As previously discussed, the arguments by the prosecution in this case were made, in part, as a response to defense counsels' arguments or were a reasonable summation of, or inference from, the evidence presented.  They were neither persistent nor pronounced in nature.  The jury was also instructed to consider all of the evidence presented, and was told "time and time again" that the lawyer's statements are not to be considered evidence.  1 CR 271, 273; 29 RR 15, 40 ("What we say is not evidence.").  Moreover, this was not a close case at punishment, as the evidence submitted by the prosecution—including evidence that Petitioner committed four murders, taunted police, and had a history of threatening law enforcement officials—was overwhelming.  For these reasons, Petitioner fails to establish *Strickland* prejudice.  *See Darden*,

477 U.S. at 182 (holding that prosecutor's argument, while improper, did not render trial unfair where argument did not misstate the evidence, did not implicate a specific right, was responsive to the defense, and the jury was instructed that counsel's arguments were not evidence, and the weight of evidence against defendant was heavy). Petitioner's claim is therefore insubstantial and does not warrant relief.

### 11.     Counsels' Closing Argument (Claim II(I))

In addition to failing to object to the State's closing argument, Petitioner contends counsel were ineffective for presenting a closing argument themselves that was "inflammatory, harmful and in conflict" with the evidence they presented at the punishment phase. Again, to prevail on such an allegation, Petitioner must show both that "counsel's representation fell below an objective standard of reasonableness" and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith v. Spisak*, 558 U.S. 139, 149 (2010) (citing *Strickland*, 466 U.S., at 688, 694). Petitioner does neither.

Petitioner correctly notes that the defensive strategy for the punishment phase was to demonstrate that Petitioner was "not normal," and that he suffered from a neglectful upbringing and a lifelong history of behavioral problems and mental illness. Citing to isolated examples of counsels' arguments that allegedly debased their client, inflamed the jury, and undermined the testimony of defense experts, Petitioner now contends that counsel abandoned this strategy during closing argument. But in considering whether counsels' closing arguments were ineffective, the Court must consider the closing statements in their entirety. *Carter v. Johnson*, 131 F.3d 452, 466 (5th Cir. 1997); *Teague v. Scott*, 60 F.3d at 1173. This is because trial counsel have broad discretion when it comes to deciding how best to proceed during a closing argument.

*See Ward*, 777 F.3d at 264 (the Supreme Court has emphasized counsel has "wide latitude in deciding how best to represent a client"); *Clark v. Thaler*, 673 F.3d 410, 427 (5th Cir. 2012) (recognizing the broad deference to which counsel is entitled in making tactical decisions in closing argument) (quoting *Yarborough*, 540 U.S. at 5-6).

When looking at the entire record, it is clear that counsel did not abandon their defensive strategy as Petitioner now asserts. While at times inartful, both trial counsel—Robert Harris and John Donahue—repeatedly insinuated throughout their arguments, either directly or indirectly, that Petitioner should not be given the death penalty because he was "flawed" and "not normal." *See, e.g.,* 29 RR 17 (stating Petitioner was "flawed" and that his soul was "probably broken before it was born"), 21 (implying Petitioner was "damaged"), 28 (stating people started noticing from an early age Petitioner "just isn't right"), 30 (Petitioner "not normal" and should not be held to same level of accountability as a "normal" person). Both counsel also spent a significant portion of argument time blaming Petitioner's neglectful upbringing for his flaws. *Id.* at 19-20 (explaining that Petitioner did not have the "luxury" of having his father present or a mother who filled in that role, and noting Petitioner's father initially wanted him aborted and did not even show up for trial), 23-24 (suggesting his mother's abandonment as a reason for Petitioner's flaws), 28 ("And if you want to look at a child, look at the parents"), 31-32 (recounting testimony regarding neglectful childhood and that nobody recognized a need for help until it was too late). Counsel also touched on the mental health evidence presented at punishment. *Id.* at 18-20 (summarizing testimony from the defense's three experts), 21 (each expert came to their own conclusions and agreed Petitioner was "damaged goods"), 30-31 (Petitioner has a mental disorder which renders him unable to control his worst impulses).

In closing, counsel then explained their strategy once more to the jury:  "What we tried to do is explain to you where [Petitioner] came from, why he is the way he is, [and] what happened in his life."  Although Petitioner faults counsel for not "endorsing" the testimony of his experts further, their closing arguments accomplished all of their stated goals and served to "sharpen and clarify the issues for resolution" by the jury.  *Clark*, 673 F.3d at 427 (quoting *Yarborough*, 540 U.S. at 6).  While in hindsight Petitioner may wish that counsel presented a different closing argument, given the wide range of available strategies, reiterating the testimony given by experts in more detail was not required.  *See Ries v. Quarterman*, 522 F.3d 517, 529 (5th Cir. 2008) ("[Ries's] desire to have a specific defense theory presented does not amount to ineffective assistance on federal habeas review") (citing *Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007)).

In sum, the Court concludes that the arguments given by counsel, as a whole, were the product of objectively reasonable representation that fell within "the wide range of reasonable professional assistance" and did not constitute ineffective assistance.  *Strickland*, 466 U.S. at 689.  Moreover, for the reasons discussed in the previous section, Petitioner cannot demonstrate prejudice.  *See* Section C(10)(e), *supra*.  Thus, because he fails to satisfy either prong of the *Strickland* analysis, Petitioner's claim is insubstantial and does not warrant federal habeas relief.

### 12.   <u>Petitioner's Eligibility for the Death Penalty</u> (Claim III)

In Claim III, Petitioner contends trial counsel were ineffective for not asserting that his congenital birth defects—KS and FASD—and resultant mental impairments rendered him ineligible for the death penalty.  Because individuals who suffer from KS and FASD exhibit many of the same executive and adaptive functioning deficits as those exhibited by the intellectually disabled, Petitioner contends the Supreme Court's prohibition on the execution of

the intellectually disabled under *Atkins v. Virginia*[27] should logically extend to the execution of those with severe mental illness.  Petitioner's allegation lacks merit for the following reasons.

To start, contrary to Petitioner's assertion, trial counsel did attempt to preclude the death penalty as a sentencing option based on Petitioner's severe mental illness.  Prior to trial, counsel filed a lengthy motion arguing the constitutional protections provided for the intellectually disabled under *Atkins* should apply equally to those, such as Petitioner, who suffer from a severe mental illness.  1 CR 134-42.  Counsel made the same arguments at a pre-trial hearing on the motion, but the trial court ultimately denied the motion prior to the close of the punishment phase.  8 RR 4-25; 29 RR 8.  Although counsel did not specifically mention any diagnosis of KS or FASD in their motion or at the pre-trial hearing, the argument presented by counsel is virtually identical to the one Petitioner now claims they should have made.  That is, due to their impaired judgment, reasoning, and impulse control, those who suffer from severe mental illness are "morally indistinguishable" from the intellectually disabled because "they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct."  ECF No. 90 at 279 (citing *Atkins*, 436 U.S. at 306).  Any argument by counsel concerning Petitioner suffering from KS or FASD would therefore have been redundant.

Furthermore, as discussed previously by this Court in its February 2012 Order denying federal habeas relief (ECF No. 42 at 16), such a motion would be futile because the prohibitions against executing the intellectually disabled have not been extended to individuals who may be mentally ill, including those who suffer from KS or FASD.  *See Soliz v. Davis*, 750 F. App'x 282, 291 (5th Cir. 2018) (unpublished) (upholding rejection of argument that *Atkins* should be expanded to make those afflicted with FASD categorically ineligible for the death penalty); *Shore v. Davis*, 845 F.3d 627, 634 (5th Cir. 2017); *Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir.

---

[27]  536 U.S. 304 (2002).

2014); *ShisInday v. Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007); *In re Neville*, 440 F.3d 220,

221 (5th Cir. 2006). Petitioner points to no Supreme Court decision recognizing an extension of

*Atkins* to those suffering from KS or FASD, much less mental illness in general.

Consequently, any argument by trial counsel on these grounds would have been just as

unsuccessful as the motion actually filed. Counsels' failure to raise this meritless argument does

not constitute a meritorious IATC claim because counsel is not required to raise futile objections,

and the result of the proceeding would not have been different even if they had. *Roberts*, 681

F.3d at 612 ("[T]he failure to lodge futile objections does not qualify as ineffective assistance.")

(quoting *Koch*, 907 F.2d at 527); *Ward*, 420 F.3d at 498 (same). Claim III is therefore

insubstantial and does not warrant federal habeas relief.

### 17.     Petitioner's Cumulative-Error Claims (Claims I(E) and II(J))

Finally, Petitioner argues that even if none of the above allegations independently entitle

him to relief, their cumulative prejudicial effect denied him his right to the effective assistance of

counsel at both the guilt/innocence and punishment phases of trial. The Fifth Circuit has made it

clear that cumulative-error analysis applies only in "rare instances" where there is constitutional

error to cumulate. *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (en banc);

*Derden v. McNeel*, 938 F.2d 605, 609 (5th Cir. 1991). "Meritless claims or claims that are not

prejudicial cannot be cumulated, regardless of the total number raised." *Pondexter v.*

*Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008).

As discussed throughout this opinion, none of the claims raised by Petitioner establish

that trial counsels' performance was deficient under the *Strickland* analysis. Even if counsel

were considered deficient in one or more of the allegations, this Court has found no instances

where Petitioner was prejudiced by counsels' allegedly deficient conduct. Accordingly, there is

no prejudicial effect for this Court to cumulate.  *United States v. Thomas*, 724 F.3d 632, 648 (5th Cir. 2013) ("[T]here is no precedent supporting the idea that a series of 'errors' that fail to meet the standard of objectively unreasonable can somehow cumulate to meet the high burden set forth in *Strickland*."); *United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006) ("Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions").  *Pondexter*, 537 F.3d at 525 (finding "[m]eritless claims or claims that are not prejudicial cannot be cumulated").  Petitioner's cumulative-error claims therefore are neither substantial nor do they warrant federal habeas corpus relief under a *de novo* standard of review.

## IV.  Certificate of Appealability

The Court must now determine whether to issue a certificate of appealability (COA).  *See* Rule 11(a) of the Rules Governing § 2254 Proceedings; *Miller-El v. Cockrell,* 537 U.S. 322, 335-36 (2003) (citing 28 U.S.C. § 2253(c)(1)).  Under 28 U.S.C. § 2253(c)(2), a COA may issue only if a petitioner makes "a substantial showing of the denial of a constitutional right."  This requires Petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327).

The Supreme Court has explained that the showing required under § 2253(c)(2) is straightforward when a district court has rejected a petitioner's constitutional claims on the merits:  The petitioner must demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).  The issue becomes somewhat more complicated when the district court denies relief

on procedural grounds.  *Id*.  In that case, the petitioner seeking COA must show both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Gonzalez v. Thaler*, 565 U.S. 134, 140-41 (2012) (citing *Slack,* 529 U.S. at 484).  Whatever the basis for the denial, however, the court must bear in mind that "[w]here the petitioner faces the death penalty, 'any doubts as to whether a COA should issue must be resolved' in the petitioner's favor.'"  *Allen v. Stephens*, 805 F.3d 617, 625 (5th Cir. 2015) (quoting *Medellin v. Dretke*, 371 F.3d 270, 275 (5th Cir. 2004)), *abrogated on other grounds by Ayestas v. Davis*, 138 S. Ct. 1080 (2018).

In this case, the Court was tasked with determining whether, under *Martinez v. Ryan*, Petitioner has established (1) the ineffectiveness of his state habeas counsel, and (2) a substantial IATC claim.  *Garza*, 738 F.3d at 676; (ECF No. 64).  For the first prong, Petitioner presented significant evidence of mental health issues and argued state habeas counsel were ineffective for failing to challenge his competency to waive his appeals.  Given this evidence and the fact that COA should issue in a death penalty case if any doubt exists, the Court concludes the issue of the effectiveness of Petitioner's state habeas counsel deserves encouragement to proceed further. Accordingly, the Court will grant Petitioner a COA on whether Petitioner's state habeas counsel rendered ineffective assistance for failing to challenge his competency.

For the second prong of the *Martinez* analysis, the Court similarly concludes that Petitioner's Claim II(F) deserves encouragement to proceed further.  In that allegation, Petitioner argued his trial counsel were ineffective for failing to object to the presentation of extraneous victim-impact testimony at the punishment phase of trial.  While recognizing that some of this testimony may have been admitted erroneously, the Court nevertheless found the claim to be

insubstantial because the admission of the testimony in question was harmless. *See* Section C(8), *supra*. However, the question of whether the testimony was so "unduly prejudicial that it render[ed] the trial fundamentally unfair" is a close and difficult one, and this Court acknowledges that a different jurist might reasonably reach a different determination as to whether petitioner was prejudiced by counsels' failure to raise such an objection. *Payne*, 501 U.S. at 824-25. The Court will therefore grant Petitioner a COA on Claim II(F) as to whether Petitioner was prejudiced by trial counsels' failure to object to this evidence.

For the remaining IATC claims raised by Petitioner, he has not made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor could reasonable jurists debate the denial of federal habeas corpus relief on either substantive or procedural grounds, or find that the issues presented are adequate to deserve encouragement to proceed further. *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484). As such, no further COA is warranted.

## V. <u>Conclusion and Order</u>

The Court has thoroughly reviewed the extensive record and pleadings submitted by both parties in this case, as well as the 1,000-plus pages of exhibits submitted on Petitioner's behalf (ECF Nos. 90, 93, 94, 121, 122, 132, 133). After careful consideration, the Court concludes the new IATC allegations raised in Petitioner's amended petition (ECF No. 90) are unexhausted and procedurally barred and that Petitioner fails to establish cause to excuse the procedural bar pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). Alternatively, even when evaluated under a *de novo* standard of review, these claims do not warrant federal habeas relief because they lack merit.

Accordingly, based on the foregoing reasons, **IT IS ORDERED** that:

1.  Federal habeas corpus relief is **DENIED** and Petitioner Richard Lee Tabler's Amended Petition for Writ of Habeas Corpus on Remand (ECF No. 90) is **DISMISSED WITH PREJUDICE**;

2.  A limited Certificate of Appealability is **GRANTED** in this case; and

3.  All other remaining motions are **DENIED**, and this case is now **CLOSED**.

It is so **ORDERED**.

**SIGNED this the 10th day of June, 2021.**

**ROBERT PITMAN**
**UNITED STATES DISTRICT JUDGE**